**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **SEMINOLE TRIBE OF FLORIDA**<br>6300 Stirling Road<br>Hollywood, Florida 33024<br><br>PLAINTIFF,<br><br>v.<br><br>**ALEX M. AZAR**, in his official capacity as Secretary,<br>U.S. Department of Health & Human Services<br>200 Independence Ave, S.W.<br>Washington, DC 20201<br><br>**RADM MICHAEL D. WEAHKEE**, in his official capacity as Acting Director,<br>Indian Health Service<br>5600 Fishers Lane<br>Rockville, MD 20857<br><br>DEFENDANTS. | ) | Civil Action No. 18-776<br><br>**COMPLAINT** |

Served: The Honorable Jeff Sessions
Attorney General of the United States
Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530-0001

The Honorable Jessie K. Liu
United States Attorney for the District of Columbia
Judiciary Center Building
555 Fourth Street, NW
Washington, D.C. 20530

**COMPLAINT FOR DECLARATORY, MANDAMUS AND INJUNCTIVE RELIEF**

The Plaintiff, for its cause of action against the Defendants named above, alleges as follows:

**INTRODUCTION**

1. This action is brought by the Seminole Tribe of Florida ("Tribe") against the Secretary of Health and Human Services and the Acting Director of the Indian Health Service ("IHS") under the Indian Self-Determination and Education Assistance Act ("ISDEAA"). The Tribe is a participant in the Self-Governance program under Title V of the ISDEAA and has a Compact and Funding Agreement ("FA") with the IHS, under which the Tribe carries out IHS health care delivery programs for its members and other eligible Indians in the Tribe's service area. This action appeals an IHS rejection of the Tribe's proposal for indirect contract support costs ("CSC") for its fiscal year 2018 FA.

2. Section 110(a) of the ISDEAA, 25 U.S.C. § 5331(a), provides this Court with original jurisdiction over funding disputes between an Indian tribe and the Secretary. In this case, the disagreement between the Tribe and the Secretary involves the scope of the Tribe's statutory authority to spend its federal funding in the way the Tribe deems best for the health and welfare of its citizens. The Tribe contends that it has explicit authority under the ISDEAA to decide for itself how much of its IHS funding to allocate to salaries, wages, and fringe benefits. The IHS maintains that it can impose an 80% "cap" on the amount of IHS funds that the Tribe spends on salaries, wages, and fringe benefits for Tribal employees. This 80% cap does not appear in the ISDEAA, its implementing regulations, or even in IHS's policy manuals. Nevertheless, the IHS imposes the 80% cap to reduce the amount of indirect CSC that the Tribe receives from the IHS.

3. In FY 2018, the Tribe proposed to allocate 98.93% of its IHS funding to salaries, wages, and fringe benefits (referred to hereinafter for simplicity as "salaries")—well above IHS's 80% cap. Doing so allowed the Tribe to generate additional funding for CSC, the

reasonable administrative and overhead costs associated with running the IHS-funded portion of the Tribe's health program. IHS rejected the Tribe's proposal in part, imposing the 80% cap, which cost the Tribe $159,483 in CSC for FY 2018.

4. The Tribe respectfully asks this Court for relief under section 110 of the ISDEAA, which authorizes actions against the agency for money damages or injunctive relief against any action by an officer of the United States contrary to the ISDEAA, including injunctive relief to reverse the IHS decision and compel the IHS to fund the contract as proposed. 25 U.S.C. § 5331(a); *see also* 25 U.S.C. § 5391(a) ("contract," for purposes of Section 110, includes compacts and funding agreements, such as the Tribe's, under Title V of the ISDEAA).

**PARTIES**

5. The Plaintiff, the Seminole Tribe of Florida, is a federally recognized Indian tribe.[1] The Tribe operates health care facilities in Florida, including at the following locations: Hollywood, Tampa, Immokalee, Clewiston, and Okeechobee. The Tribe operates health facilities and provides health care services to its members and other beneficiaries pursuant to its self-governance compact and funding agreements with the IHS under Title V of the ISDEAA, 25 U.S.C. § 5381 et seq.

6. Defendant Alex M. Azar, the Secretary of Health and Human Services ("Secretary"), has overall responsibility for carrying out all the functions, responsibilities, authorities and duties of the U.S. Department of Health and Human Services, including oversight of the IHS, an agency within the Department. He is sued in his official capacity.

---

[1] Dep't of the Interior, *Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs*, 82 FED. REG. 4915, 4918 (Jan. 17, 2017).

7. Defendant Rear Admiral Michael D. Weahkee is the Acting Director of the IHS, the agency charged by law with the responsibility for implementing the ISDEAA and other health laws benefiting American Indians and Alaska Natives, on behalf of the United States. 25 U.S.C. § 1661(c)(3). He is sued in his official capacity.

## JURISDICTION AND VENUE

8. This court has jurisdiction under § 110(a) of the ISDEAA, 25 U.S.C. § 5331(a), which provides in pertinent part:

> The United States district courts shall have original jurisdiction over any civil action or claim against the appropriate Secretary arising under this [Act] . . . In an action brought under this paragraph, the district courts may order appropriate relief including money damages, injunctive relief against any action by an officer of the United States or any agency thereof contrary to this [Act] or regulations promulgated thereunder, or mandamus to compel an officer or employee of the United States, or any agency thereof, to perform a duty provided under this [Act] or regulations promulgated hereunder (including immediate injunctive relief to reverse a declination finding under section 5321(a)(2) of this title or to compel the Secretary to award and fund an approved self-determination contract).

9. Section 5331(a) is made applicable to self-governance compacts and funding agreements under 25 U.S.C. § 5391(a). A self-governance tribe, in lieu of administratively appealing an IHS rejection of its final offer, may “directly proceed to initiate an action in a Federal district court pursuant to section 5331(a) of this title,” 25 U.S.C. § 5387(c)(1)(C).

10. Venue is proper under 28 U.S.C. § 1391(e) because the U.S. Department of Health and Human Services is located in the District of Columbia.

## STATUTORY BACKGROUND

11. The ISDEAA authorizes Indian tribes and tribal organizations to assume responsibility to administer programs, functions, services and activities (“PFSAs”) that the Secretary would otherwise be obligated to provide under federal law to Indians and Alaska Natives. 25 U.S.C. § 5321(a)(1). The purpose of the ISDEAA is to reduce federal domination of

Indian programs and promote tribal self-determination and self-governance. 25 U.S.C. § 5302(b); *Cherokee Nation v. Leavitt*, 543 U.S. 631, 639 (2005). The ISDEAA reflects the United States' commitment "to supporting and assisting Indian tribes in the development of strong and stable tribal governments, capable of administering quality programs and developing the economies of their respective communities." 25 U.S.C. § 5302(b).

12. Title V of the ISDEAA requires the Secretary to establish and carry out within the IHS a program known as the "Tribal Self-Governance Program." 25 U.S.C. § 5382. Title V requires the Secretary to negotiate and enter into self-governance compacts and funding agreements with tribes and tribal organizations participating in the self-governance program. 25 U.S.C. § 5384 and § 5385. The Tribe carries out a compact and funding agreement under Title V.

13. 25 U.S.C. § 5385(b) requires that each funding agreement shall, "as determined by the Indian tribe," include all PFSAs administered by the IHS under certain listed laws, including the Indian Health Care Improvement Act, 25 U.S.C. § 1601, et seq. By statute, the amount of funding provided by the Secretary for operation of the PFSAs included in each funding agreement must be at least as much as the Secretary would have spent on the PFSAs (or portions thereof) had the Secretary continued to operate them himself. 25 U.S.C. § 5325(a)(1); 25 U.S.C. § 5396 (making 25 U.S.C. § 5325 applicable to Title V compacts and funding agreements). This amount is often referred to as the "Secretarial amount."

14. The ISDEAA requires IHS to pay, in addition to the Secretarial amount, contract support costs or CSC, the reasonable administrative and overhead costs associated with carrying out the PFSAs, *see* 25 U.S.C. § 5325(a)(2) and (3).[2] *See also* 25 U.S.C. § 5396(a) (Title V

[2] Section 106(a)(2) of the ISDEAA mandates as follows:

provision stating that "[a]ll provisions of sections . . . 5325(a) through (k) . . . of [Title 25 U.S.C.] . . . shall apply to compacts and funding agreements authorized by this part").

15. The ISDEAA requires that, upon approval of the contract, "the Secretary shall add to the contract the full amount of funds to which the contractor is entitled [under section 106(a) of the ISDEAA]," including CSC. 25 U.S.C. § 5325(g) (emphasis added). The U.S. Supreme Court has held, twice, that the ISDEAA requires the Government to pay *full* CSC. *Salazar v. Ramah Navajo Chapter*, 567 U.S. 182, 185 (2012) ("we hold that the Government must pay each tribe's contract support costs in full"); *Cherokee Nation*, 543 U.S. at 634 ("The [ISDEAA] specifies that the Government must pay a tribe's costs, including administrative expenses.").

16. A cornerstone of self-governance under Title V is tribal authority to redesign federal programs and reallocate federal funds. Recognizing that tribal governments are better positioned to evaluate the needs and priorities of their people than are federal officials, Congress gave tribes broad redesign and reallocation authority:

> An Indian tribe may redesign or consolidate programs, services, functions, and activities (or portions thereof) included in a funding agreement under section 5385 of this title and reallocate or redirect funds for such programs, services, functions, and activities (or portions thereof) in any manner which the Indian tribe deems to be in the best interest of the health and welfare of the Indian community being served, only if the redesign or consolidation does not have the effect of denying eligibility for services to population groups otherwise eligible to be served under applicable Federal law.

---

> (2) There shall be added [to the 106(a)(1) amount] contract support costs which shall consist of an amount for the reasonable costs for activities which must be carried on by a tribal organization as a contractor to ensure compliance with the terms of the contract and prudent management, but which—
>
> (A) normally are not carried on by the respective Secretary in his direct operation of the program; or
>
> (B) are provided by the Secretary in support of the contracted program from resources other than those under contract.

25 U.S.C. § 5325(a)(2).

25 U.S.C. § 5386(e).

17. In the negotiation of compacts and funding agreements, the Secretary shall at all times negotiate in good faith to maximize implementation of the self-governance policy. 25 U.S.C. § 5387(e).

18. Title V of the ISDEAA provides for a "final offer" process in the event of a stalemate in negotiations for funding agreements. Section 507(b) of the ISDEAA, 25 U.S.C. § 5387(b), provides:

> In the event the Secretary and a participating Indian tribe are unable to agree, in whole or in part, on the terms of a compact or funding agreement (including funding levels), the Indian tribe may submit a final offer to the Secretary. Not more than 45 days after such submission, or within a longer time agreed upon by the Indian tribe, the Secretary shall review and make a determination with respect to such offer. In the absence of a timely rejection of the offer, in whole or in part, made in compliance with subsection (c), the offer shall be deemed agreed to by the Secretary.

19. Subsection 507(c) of the ISDEAA, 25 U.S.C. § 5387(c), provides that if the Secretary rejects a final offer, the Secretary shall provide timely written notification to the Indian tribe that contains a specific finding that clearly demonstrates, or that is supported by a controlling legal authority, that one or more of the following four reasons for rejection apply:

> (1) the amount of funds proposed in the final offer exceeds the applicable funding level to which the Indian tribe is entitled under this part;
>
> (2) the program, function, service, or activity (or portion thereof) that is the subject of the final offer is an inherent federal function that cannot legally be delegated to an Indian tribe;
>
> (3) the Indian tribe cannot carry out the program, function, service, or activity (or portion thereof) in a manner that would not result in significant danger or risk to the public health; or

(4) the Indian tribe is not eligible to participate in self-governance under section 5383 of this title.

20. In any civil action challenging the rejection of a final offer, such as this one, "the Secretary shall have the burden of demonstrating by clear and convincing evidence the validity of the grounds for rejecting the offer (or a provision thereof)." 25 U.S.C. § 5387(d).

**GENERAL ALLEGATIONS**

21. When IHS provides direct services to a tribe, the PFSAs are funded not only by funds appropriated by Congress, but by third-party revenues—collections from Medicare, Medicaid, and private insurers. In fact, each year in its budget request to Congress, IHS estimates how much third-party revenue will be collected and available to spend on services, based on past collections. *See*, *e.g.*, Dep't of Health & Human Servs., *Indian Health Service FY 2018 Justification of Estimates for Appropriations Committees*, at CJ-143 (reporting that in FY 2016, IHS collected $1.194 billion from third-party insurers). "Public and private collections represent a significant portion of the IHS and Tribal health care delivery budgets." *Id*.

22. By the same token, the Tribe, when carrying out PFSAs under its compact and funding agreement, is required by law and contract to collect third-party revenues and use them to provide further services within the scope of the agreements with IHS. Title V of the ISDEAA mandates as follows:

> (j) PROGRAM INCOME.--All Medicare, Medicaid, or other program income earned by an Indian tribe shall be treated as supplemental funding to that negotiated in the funding agreement. The Indian tribe may retain all such income and expend such funds in the current year or in future years except to the extent that the Indian Health Care Improvement Act (25 U.S.C. 1601 et seq.) provides otherwise for Medicare and Medicaid receipts. Such funds shall not result in any offset or reduction in the amount of funds the Indian tribe is authorized to receive under its funding agreement in the year the program income is received or for any subsequent fiscal year.

25 U.S.C. § 5388(j). Thus, by law, these funds are part of the federal program carried out by the Tribe under its ISDEAA agreements. *See Navajo Health Foundation—Sage Memorial Hospital, Inc. v. Burwell*, 2016 WL 7436470, at *68 (D.N.M. 2016).

23. Similarly, the Tribe's compact provides as follows:

> All Medicare, Medicaid and other reimbursement funds collected by the [Tribe] shall be treated as additional, supplemental funding to that negotiated in the FA. The [Tribe] may, at its option, retain all such Medicare, Medicaid and other reimbursement funds and either expend these funds according to a plan adopted by the [Tribe] or carry the funds forward for expenditure in succeeding years. In no event shall the amounts negotiated into any FA be offset or reduced by reason or amounts of the Medicare, Medicaid or other reimbursement funds collected by the [Tribe].

Compact of Self-Governance Between Seminole Tribe of Florida and United States Department of Health and Human Services, Indian Health Service, Art. III, § 5.

24. The Tribe collects third-party revenues that are available, and indeed must be used, to supplement funding provided by IHS to provide services under the compact and funding agreement.

25. This action involves an impasse in the negotiations of the parties over the Tribe's FY 2018 funding agreement—specifically, the amount of indirect CSC due under that agreement.[3]

26. As noted above, the ISDEAA requires IHS to pay full CSC. *Ramah*, 567 U.S. at 185; *Cherokee Nation*, 543 U.S. at 634. For the Tribe, as for most tribes, the full amount of indirect CSC is determined by multiplying a negotiated indirect cost rate by the amount of the direct cost base. The Tribe's most recent indirect cost rate agreement with the Department of the Interior's Interior Business Center, which applies government-wide, calls for an indirect cost rate

[3] The ISDEAA also requires full payment of direct CSC, see 25 U.S.C. § 5325(a)(3)(A)(i), but direct CSC is not at issue in this action.

of 28.32% on a direct cost base comprised of "Total direct salaries and wages, including fringe benefits."

27. IHS accepts the Tribe's rate, as it must. The controversy is over the amount of the direct cost base. Specifically, the issue is whether the Tribe is free to allocate as much of its IHS direct cost funding to salaries as it sees fit, or whether IHS can impose a limitation based on what it feels is a reasonable allocation.

28. This dispute has spanned the last several years. Based on its "reasonableness" argument, in FY 2015 and FY 2016 IHS limited the Tribe's allocation to 80% of total IHS direct cost funding. In FY 2017, IHS agreed to an allocation of 83.16% of total direct funding.

29. During FY 2018 negotiations, the Tribe again took the position that it is free to allocate as much of its IHS direct cost funding to salaries as it sees fit, in accordance with section 506(e) of the ISDEAA. Doing so would maximize the Tribe's direct cost base, and thus the amount of indirect CSC funding from IHS. These additional funds for administrative expenses, in turn, would free up program funding to provide badly needed health care programs and services.

30. IHS disagreed. The agency pointed out that the ISDEAA defines CSC as the "reasonable" costs of administering programs. Spending all of the IHS funding on salaries would not be reasonable, IHS argued, because it would leave nothing for medicine, equipment, supplies, facilities, and other costs associated with running a health care operation.

31. In August of 2017, the parties exchanged draft FY 2018 funding agreements with different amounts of indirect CSC due to this issue. On August 31, 2017, the parties held an in-person meeting in Nashville, which failed to resolve the matter.

32. In a letter dated October 30, 2017—but received by IHS on January 4, 2018—the

Tribe presented a final offer in accordance with the ISDEAA, 25 U.S.C. §§ 5387(b)–(d).[4]  Of the total available IHS direct cost funding of $7,379,916, the Tribe proposed to spend 98.93%, or $7,301,116, on salaries, wages, and fringe.  Applying the Tribe's indirect cost rate of 28.32% yields a gross indirect CSC need of $2,067,676.  Subtracting a credit to IHS for indirect-cost funding of $167,409 contained within the Secretarial amount, the Tribe's proposed net indirect CSC need was $1,900,269.[5]

33.    On February 16, 2018, IHS issued a letter to Chairman Marcellus Osceola partially rejecting the Tribe's final offer ("IHS Rejection Letter").  IHS invoked the criterion at 25 U.S.C. § 5387(c)(1)(A)(i), which says IHS may reject a final offer that "exceeds the applicable funding level to which the [Tribe] is entitled."  To support this conclusion, IHS reasoned as follows:  The ISDEAA says that CSC is payable only for direct and indirect costs related to "the operation of the Federal program," *see* 25 U.S.C. § 5325(a)(3)(A)—not on program "expansions" funded by non-federal dollars such as tribal funds or third-party revenues from Medicare, Medicaid, and private insurers.  If IHS had been providing direct services to the Tribe, of the $7,379,916 in available funding, IHS would have spent only 71% on salaries and fringe.  The rest would have been spent on program expenses such as supplies, utilities,

---

[4] See also the final offer regulations at 42 C.F.R. §§ 137.130 to 137.155.

[5] This credit derives from the IHS CSC policy's longstanding "80/20 rule" for treating a tribe's shares of Area Office and Headquarters funding, a significant portion of which is for administrative functions.  Under this rule, 80% of such funds are deemed to be direct costs and part of the direct cost base, and thus generate indirect CSC funding, while 20% are deemed to be indirect cost funding, are not part of the direct cost base, and are applied as an offset to the indirect CSC otherwise due.  In this case, the Tribe's Area and Headquarters shares totaled $837,035, so the 20% offset amounted to $167,409.  The 80/20 rule is not at issue in this action.  The IHS CSC Policy is available online at https://www.ihs.gov/IHM/index.cfm?module=dsp_ihm_pc_p6c3.

Purchased/Referred Care, etc. IHS Rejection Letter at 8.[6] The Tribe, allocating almost all of its IHS funding to salaries, is forced to pay for these types of expenses with non-IHS funds (third-party revenues or tribal funds). IHS argues that the ISDEAA precludes the agency from paying CSC on this "expanded" portion of the Tribe's program.

34. IHS concludes the letter by rejecting the Tribe's proposal to spend 98.93% of its $7,379,916 in IHS funding on salaries, wages, and fringe, and allowing 80%, for a direct cost base of $6,655,712. This results in an indirect CSC need of $1,740,786—a reduction of $159,483 from the amount proposed by the Tribe. IHS Rejection Letter at 8-9.

35. The Tribe now challenges IHS's rejection of its final offer in this court in accordance with section 110(a) of the ISDEAA, 25 U.S.C. § 5331(a).

## CAUSES OF ACTION

COUNT 1—Declaratory Relief: IHS's 80% Cap Is Contrary to the ISDEAA

36. The allegations in Paragraphs 1–35 are herein incorporated by reference.

37. The Declaratory Judgment Act, 28 U.S.C. § 2201, authorizes this Court to grant declaratory relief.

38. The ISDEAA authorizes a tribe to "reallocate or redirect funds for [IHS programs] (or portions thereof) in any manner which the Indian tribe deems to be in the best interest of the health and welfare of the Indian community being served." 25 U.S.C. § 5386(e). The Tribe proposed to reallocate its FY 2018 IHS funding so that 98.93% was devoted to salaries. IHS rejected this proposal, imposing an 80% cap on salaries for the purpose of calculating indirect CSC need.

[6] "Purchased/Referred Care" refers to health care services from private providers paid for by the Tribe or IHS with federal funding.

39. The 80% cap appears nowhere in the ISDEAA, its implementing regulations, or even in the IHS CSC policy. The cap is contrary to the ISDEAA, which imposes no such limitation on a tribe's reallocation authority.

40. Therefore, the Tribe asks this Court to declare that IHS's imposition of the 80% limit on salaries based on its perception of "equitable" allocation is contrary to the express terms of the ISDEAA and cannot serve as the basis for rejecting the Tribe's final offer.

<u>COUNT II: Mandamus and Injunctive Relief: Award and Fund the Final Offer</u>

41. The allegations in Paragraphs 1–40 are incorporated herein by reference.

42. 25 U.S.C. § 5331(a) authorizes this court to provide mandamus relief "to compel an officer or employee of the United States, or any agency thereof, to perform a duty provided under this subchapter or regulations hereunder." Section 5331(a) also authorizes this court to provide injunctive relief "against any action by an officer of the United States or any agency thereof contrary to this subchapter . . . (including immediate injunctive relief to reverse a declination finding under section 5321(a)(2) of this title or to compel the Secretary to award and fund an approved self-determination contract)." The language "to award and fund an approved self-determination contract" applies also to self-governance compacts and funding agreements. *See* 25 U.S.C. § 5391(a) ("For purposes of section 5331 of this title, the term "contract" shall include compacts and funding agreements entered into under this part.").

43. The IHS's rejection of the Tribe's final offer received January 4, 2018 was contrary to the ISDEAA and its implementing regulations. The IHS's rejection letter did not establish that the statutory rejection criterion relied on—that "the amount of funds proposed in the final offer exceeds the applicable funding level to which the Tribe is entitled" under the ISDEAA—applies. (The rejection letter did not claim that any of the other criteria for rejecting a

final offer listed in 25 U.S.C. § 5387(c) applies.) IHS based its calculation of "the applicable funding level" on an arbitrary 80% salary cap with no source in the ISDEAA, but deriving instead from IHS's sense of equity. IHS's calculations, therefore, do not enable the agency to meet the heavy burden "of demonstrating by clear and convincing evidence the grounds for rejecting the offer." 25 U.SC. § 5387(d).

44. When IHS fails to meet the strict standard for rejecting a final offer, the statutory remedy is mandamus or "immediate injunctive relief to reverse [the rejection] or to compel the Secretary to award and fund" the agreement as proposed. 25 U.S.C. § 5331(a).

**PRAYER FOR RELIEF**

45. In accordance with 25 U.S.C. § 5331(a) the Tribe respectfully asks that this Court:

A. Declare that IHS's imposition of an 80% salary cap to limit the Tribe's statutory right to reallocate its IHS funding in the manner that best serves the Community is contrary to the ISDEAA;

B. Grant injunctive and mandamus relief to reverse the IHS's rejection of the Tribe's January 4, 2018 final offer and to compel the Defendants to enter into the FY 2018 funding agreement as proposed by the Tribe;

C. Award interest on the amount in subparagraph B from the date of the decision rejecting the final offer under the Prompt Payment Act or other applicable law;

D. Award reasonable attorney fees and expenses in favor of the Tribe under the Equal Access to Justice Act, 28 U.S.C. § 2412, and any other applicable law; and

E. Grant such other relief as the Court deems just.

Respectfully submitted,

s/ Caroline P. Mayhew
Caroline P. Mayhew (DC Bar No. 1011766)
Hobbs, Straus, Dean, & Walker LLP
2120 L St. NW, Suite 700
Washington, DC 20037
202-822-8282 (Tel.)
202-296-8834 (Fax)

Geoffrey D. Strommer
Stephen D. Osborne
Hobbs, Straus, Dean & Walker, LLP
516 SE Morrison Street, Suite 1200
Portland, OR 97214
503-242-1745 (Tel.)
503-242-1072 (Fax)

Attorneys for the Seminole Tribe of Florida

DATED: April 5, 2018.