# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **SEMINOLE TRIBE OF FLORIDA**, | ) | |
| | ) | Case No. 1:18-cv-00776-RC |
| PLAINTIFF, | ) | |
| | ) | |
| v. | ) | |
| | ) | **PLAINTIFF'S MOTION FOR** |
| **ALEX M. AZAR, et al.**, | ) | **SUMMARY JUDGMENT** |
| | ) | |
| DEFENDANTS. | ) | ORAL HEARING REQUESTED |
| | ) | |
| | ) | |
| | ) | |

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, The Seminole Tribe of Florida ("Tribe"), by and through the undersigned counsel, respectfully moves pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment in the Tribe's favor. The essential facts of this case, as set forth in the accompanying Plaintiff's Statement of Material Facts Not in Genuine Dispute, cannot be genuinely disputed. Therefore, as demonstrated in the accompanying Memorandum of Points and Authorities, the Tribe is entitled to judgment as a matter of law.

Specifically, the Tribe asks that this Court enter judgment as follows:

1.     Declare that IHS's imposition of an 80% salary cap to limit the Tribe's statutory right to reallocate its IHS funding in the manner that best serves the Community is contrary to the ISDEAA;

2.     Grant injunctive and mandamus relief to reverse the IHS's rejection of the Tribe's January 4, 2018 final offer and to compel the Defendants to enter into the FY 2018 funding agreement as proposed by the Tribe;

3.      Award interest on the amount in subparagraph 2 from the date of the decision

rejecting the final offer under the Prompt Payment Act or other applicable law;

4.      Award reasonable attorney fees and expenses in favor of the Tribe under the

Equal Access to Justice Act, 28 U.S.C. § 2412, and any other applicable law; and

5.      Grant such other relief as the Court deems just.

In support of its Motion for Summary Judgment, the Tribe submits a Statement of

Material Facts Not in Genuine Dispute and a Memorandum of Points and Authorities with

exhibits attached and factual citations from the Record.  In addition, the Tribe requests an oral

hearing on this motion pursuant to LCvR 7(f).

Respectfully submitted,

 s/ Kaitlyn Klass
Kaitlyn Klass (DC Bar No. 1032219)
Hobbs, Straus, Dean, & Walker LLP
2120 L St. NW, Suite 700
Washington, DC  20037
202-822-8282 (Tel.)
202-296-8834 (Fax)

Geoffrey D. Strommer, *pro hac vice*
Stephen D. Osborne, *pro hac vice*
Hobbs, Straus, Dean & Walker, LLP
806 SW Broadway, Suite 900
Portland, OR 97205
503-242-1745 (Tel.)
503-242-1072 (Fax)

Attorneys for the Seminole Tribe of Florida

DATED: June 14, 2018.

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **SEMINOLE TRIBE OF FLORIDA**, | ) | |
| | ) | Case No. 1:18-cv-00776-RC |
| PLAINTIFF, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OF POINTS** |
| | ) | **AND AUTHORITIES** |
| **ALEX M. AZAR, et al.**, | ) | **IN SUPPORT OF PLAINTIFF'S** |
| | ) | **MOTION FOR SUMMARY** |
| DEFENDANTS. | ) | **JUDGMENT** |
| | ) | |
| | ) | ORAL HEARING REQUESTED |
| | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION AND SUMMARY ................................................................... 1

LEGAL AND FACTUAL BACKGROUND ....................................................... 2

    A. Self-Governance Under Title V of the ISDEAA .................................... 2

    B. Reallocation Authority ........................................................................... 4

    C. Contract Support Costs........................................................................... 5

    D. Procedural History: The Final Offer and the IHS Response................. 7

STANDARD OF REVIEW ................................................................................ 8

    A. Summary Judgment................................................................................ 8

    B. Review of Agency Action Under the ISDEAA ..................................... 9

    C. Statutory Interpretation Under the ISDEAA ....................................... 11

SUMMARY OF ARGUMENT ........................................................................ 12

ARGUMENT .................................................................................................... 12

    I. The ISDEAA Allows Tribes to Allocate Funding to Best Serve the Needs

       of the Tribal Community .................................................................... 12

    II. IHS's Arguments for Limiting the Tribe's Reallocation Authority Have

       No Basis in Law or Policy ................................................................. 14

       A. Expending More Funding on Salaries than IHS Does Is Not an "Expansion"

          of the Program................................................................................ 14

       B. Expending More than 80% on Salaries Would Not Be Unreasonable Here,

          Where the Tribe has Other Funds Available to Cover Non-Salary Costs ...... 18

       C. The 80% Cap is Arbitrary, Not "An Equitable *Pro Rata* Share" of Salaries

          as IHS Argues ............................................................................... 19

III. Since IHS Failed to Meet its Burden for Rejecting the Tribe's Final Offer,

This Court Should Issue an Order Directing IHS to Approve and Fund the

Contract as Proposed.......................................................................................... 20

CONCLUSION............................................................................................................ 21

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................. 8, 9

*Arrington v. United States*, 473 F.3d 329 (D.C. Cir. 2006) ............................................... 8

*Celotex Corp. v. Catrett, 477* U.S. 317 (1986) ................................................................. 9

*Cherokee Nation of Okla. v. U.S.*, 190 F. Supp. 2d 1248 (E.D. Okla. 2001) .................... 10

\* *Cherokee Nation v. Leavitt*, 543 U.S. 631 (2005) .................................................... 2, 6, 10

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,

    467 U.S. 837 (1984) ........................................................................................... 11

*Cheyenne River Sioux Tribe v. Kempthorne*, 496 F. Supp. 2d 1059 (D.S.D. 2007) ......... 10

*Citizen Potawatomi Nation v. Salazar*, 624 F. Supp. 2d 103 (D.D.C. 2009) ................... 10

*Cobell v. Norton*, 240 F.3d 1081 (D.C. Cir. 2001) ......................................................... 11

*Crownpoint Inst. of Tech. v. Norton*, 2005 U.S. Dist. LEXIS 48399 (D.N.M. 2005) ...... 21

*FTC v. H.J. Heinz Co.*, 246 F. 3d 708 (D.C. Cir. 2001) ................................................... 21

*Hendricks v. Geithner,* 568 F.3d 1008 (D.C. Cir. 2009) .................................................... 9

*Maniilaq Ass'n v. Burwell*, 170 F. Supp. 3d 243 (D.D.C. 2016) ....................................... 4

*Maniilaq Ass'n v. Burwell*, 72 F. Supp. 3d 227 (D.D.C. 2014) ......................................... 4

*Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759 (1985) .......................................... 11

*Muscogee (Creek) Nation v. Hodel*, 851 F.2d 1439 (D.C. Cir. 1988) ............................. 11

*Navajo Health Foundation—Sage Memorial Hospital, Inc. v. Burwell*,

    263 F. Supp. 3d 1083 (D.N.M. 2016) ................................................................ 15, 18

\* *Pyramid Lake Paiute Tribe v. Burwell*, 70 F. Supp. 3d 534 (D.D.C. 2014) ........... 9, 11, 15

*Ramah Navajo Sch. Bd. v Babbitt*, 87 F. 3d 1338 (D.C. Cir. 1996) .......................... 16, 17

*Roth v. U.S. Dep't of Justice,* 642 F.3d 1161 (D.C. Cir. 2011) ............................................ 9

*S. Ute Indian Tribe v. Sebelius*, 657 F.3d 1071 (10th Cir. 2011) .................................... 11

\* *Salazar v. Ramah Navajo Chapter*, 567 U.S. 182 (2012) ...................................... 6, 12, 17

*Seneca Nation of Indians v. U.S. Dep't of Health and Human Services*,

    945 F. Supp. 2d 135 (D.D.C. 2013) .............................................................................. 10

*Shoshone-Bannock Tribes of the Fort Hall Reservation v. Shalala*,

    988 F. Supp. 1306 (D. Or. 1997) ................................................................................. 10

*Susanville Indian Rancheria v. Leavitt*, 2008 WL 58951 (E.D. Cal. 2008) .................... 21

*Theodus v. McLaughlin,* 852 F.2d 1380 (D.C. Cir. 1988) .................................................. 9

*Tunica-Biloxi Tribe of La. v. United States*, 577 F. Supp. 2d 382

    (D.D.C. 2008) ................................................................................................ 11, 17, 19

**Statutes**

5 U.S.C. § 706 .................................................................................................................. 10

25 U.S.C. § 1601 ................................................................................................................ 2

25 U.S.C. § 1641(c) .......................................................................................................... 15

25 U.S.C. § 5301 ................................................................................................................ 1

25 U.S.C. § 5302(b) ........................................................................................................... 2

25 U.S.C. § 5321(a)(1) ....................................................................................................... 2

25 U.S.C. § 5325(a)(1) ....................................................................................................... 3

25 U.S.C. § 5325(a)(2) ....................................................................................................... 6

25 U.S.C. § 5325(a)(2) to (a)(6) ........................................................................................ 3

25 U.S.C. § 5325(a)(3)(A)(ii) ............................................................................................ 6

25 U.S.C. § 5331(a) .......................................................................................................... 21

25 U.S.C. § 5381 ................................................................................................... 2

25 U.S.C. § 5384 ................................................................................................... 2

25 U.S.C. § 5385 ................................................................................................... 2

25 U.S.C. § 5385(b) .............................................................................................. 2

* 25 U.S.C. § 5386(e) ............................................................................... 1, 5, 12, 13

25 U.S.C. § 5387(b) .............................................................................................. 3

25 U.S.C. § 5387(c) .............................................................................................. 4

25 U.S.C. § 5387(c)(1)(A) ................................................................................... 20

25 U.S.C. § 5387(c)(1)(A)(i) .......................................................................... 12, 20

25 U.S.C. § 5387(d) ..................................................................................... 4, 12, 20

25 U.S.C. § 5388(j) .............................................................................................. 15

25 U.S.C. § 5391(a) ............................................................................................. 21

25 U.S.C. § 5392(f) .............................................................................................. 11

42 U.S.C. 1396j .................................................................................................... 15

Consolidated Appropriations Act, 2018, Pub. L. No. 115-141 (March 23, 2018) ............. 6

**Regulations**

42 C.F.R. § 137.185 .......................................................................................... 5, 13

**Rules**

Fed. R. Civ. P. 56(a) ............................................................................................. 8

Fed. R. Civ. P. 56(c) ............................................................................................. 9

**Other Authorities**

Indian Health Manual, § 6-3.1C ......................................................................... 13

S. Rep. No. 100–274 (1987) ............................................................................... 10

Title V Compact of Self-Governance Between the Seminole Tribe of Florida and

the United States Department of Health and Human Services, Indian Health

Service, Art. III, § 4 ................................................................................................ 5, 13

## INTRODUCTION AND SUMMARY

The question in this case is how much indirect contract support cost ("CSC") funding the Indian Health Service ("IHS") is required to pay to the Seminole Tribe of Florida ("Tribe") in FY 2018.  The Tribe provides health care services to its members and other beneficiaries through a compact and funding agreement with IHS under the Indian Self-Determination and Education Assistance Act, 25 U.S.C. § 5301 et seq. ("ISDEAA").

The parties agree that the amount of indirect CSC owed must be calculated using the familiar "rate-times-base" equation, in which the Tribe's negotiated indirect cost rate is multiplied by the direct cost base supporting the programs carried out under the funding agreement.  The parties also agree on the applicable indirect cost rate.  So the dispute is about the size of the direct cost base.

As specified in the Tribe's indirect cost rate agreement, the Tribe's direct cost base is comprised of salaries, wages, and fringe benefits (hereinafter "salaries" for simplicity).  The Tribe proposed to allocate 98.93% of its IHS funding to salaries, increasing its direct cost base and thus its indirect CSC entitlement.  IHS refused, arguing that allocating any more than 80% of IHS funding to salaries would be unreasonable in light of the other expenses necessary to carry out the compacted programs—even though the Tribe is willing and able to cover these expenses with its own funds and third-party billings.  The ISDEAA authorizes the Tribe to reallocate funds in any manner the Tribe deems best for the community.  25 U.S.C. § 5386(e).  By contrast, IHS's 80% cap appears nowhere in the statute, its regulations, or even in IHS policy documents.  Thus this case presents a straightforward issue of statutory interpretation: Does the ISDEAA

allow IHS to arbitrarily limit the reallocation authority in § 5386(e) by imposing an 80%

salary cap on the Tribe?

## LEGAL AND FACTUAL BACKGROUND[1]

### A.  Self-Governance Under Title V of the ISDEAA

The ISDEAA authorizes Indian tribes and tribal organizations to assume

responsibility to administer programs, functions, services, and activities ("PFSAs") the

Secretary is otherwise authorized to provide under federal law to American Indians and

Alaska Natives.  25 U.S.C. § 5321(a)(1).  The purpose of the ISDEAA is to reduce

federal domination of Indian programs and promote tribal self-determination and self-

governance.  *See* 25 U.S.C. § 5302(b); *Cherokee Nation v. Leavitt*, 543 U.S. 631, 639

(2005).  The ISDEAA reflects the United States' commitment "to supporting and

assisting Indian tribes in the development of strong and stable tribal governments,

capable of administering quality programs and developing the economies of their

respective communities."  25 U.S.C. § 5302(b).

Title V of the ISDEAA, codified at 25 U.S.C. § 5381, *et seq*., established the

"Tribal Self-Governance Program" and requires the Secretary of Health and Human

Services to negotiate and enter into self-governance compacts and funding agreements

with tribes and tribal organizations participating in the Self-Governance Program.  25

U.S.C. §§ 5384 & 5385.  Title V requires that each funding agreement shall, "as

determined by the Indian tribe," include all PFSAs administered by IHS under certain

listed laws, including the Indian Health Care Improvement Act, 25 U.S.C. § 1601, *et seq.*

25 U.S.C. § 5385(b).  Tribes are entitled to "plan, conduct, consolidate, administer, and

---

[1] Pursuant to LCvR 7(h)(1), the Tribe's numbered Statement of Material Facts Not in
Genuine Dispute is attached at the end of this memorandum.

receive full tribal share funding" for the PFSAs they elect to include in the agreement.
*Id*.

Section 106(a)(1) of the ISDEAA, 25 U.S.C. § 5325(a)(1), establishes that the amount of funds to be provided "shall not be less than the appropriate Secretary would have otherwise provided for the operation of the programs or portions thereof for the period covered by the contract[.]"[2]  The amount the Secretary otherwise would have provided to operate the program as provided in § 106(a)(1) is commonly referred to as the "Secretarial amount" or the "106(a)(1) amount."

Title V of the ISDEAA anticipates that IHS and tribal compactors may sometimes reach a stalemate in negotiations over the terms of a compact or funding agreement. When that occurs, the Title V "final offer" provisions are available at the tribal compactor's option.  These statutory provisions limit the Secretary's ability to reject a final offer unless certain criteria apply.  The statute provides:

> In the event the Secretary and a participating Indian tribe are unable to agree, in whole or in part, on the terms of a compact or funding agreement (including funding levels), the Indian tribe may submit a final offer to the Secretary.  Not more than 45 days after such submission, or within a longer time agreed upon by the Indian tribe, the Secretary shall review and make a determination with respect to such offer.  In the absence of a timely rejection of the offer, in whole or in part, made in compliance with subsection (c), the offer shall be deemed agreed to by the Secretary.

25 U.S.C. § 5387(b).  If the Secretary rejects the final offer, the Secretary is required to provide "timely written notification to the Indian tribe that contains a specific finding that

---

[2] Section 106(a)(1) is applicable to Title V compacts and funding agreements by virtue of 25 U.S.C. § 5396(a).  In addition to the §106(a)(1) amount, Title V compactors are also entitled to startup costs and direct and indirect contract support costs to cover various overhead and administrative expenses associated with carrying out the PFSAs.  25 U.S.C. § 5325(a)(2) to (a)(6).

clearly demonstrates, or that is supported by a controlling legal authority," that one or

more of the following four rejection criteria apply:

> (1) the amount of funds proposed in the final offer exceeds the applicable
> funding level to which the Indian tribe is entitled under [the ISDEAA];
> (2) the program, function, service, or activity (or portion thereof) that is
> the subject of the final offer is an inherent Federal function that cannot
> legally be delegated to an Indian tribe;
> (3) the Indian tribe cannot carry out the program, function, service, or
> activity (or portion thereof) in a manner that would not result in significant
> danger or risk to the public health; or
> (4) the Indian tribe is not eligible to participate in self-governance under
> section [5383] of this title.

25 U.S.C. § 5387(c).  The statute does not allow the Secretary to reject a final offer for

any other reason.  *Id.*  Moreover, the Secretary "shall have the burden of demonstrating

by clear and convincing evidence the validity of the grounds for rejecting the offer (or a

provision thereof)[.]"  25 U.S.C. § 5387(d); *Maniilaq Ass'n v. Burwell*, 170 F. Supp. 3d

243, 247 (D.D.C. 2016).  These and other Title V provisions restrict the Secretary's

ordinary discretion and ensure that tribes are granted a great deal of flexibility in

determining how to implement their ISDEAA agreements and PFSAs.  *Maniilaq Ass'n v.

Burwell*, 72 F. Supp. 3d 227, 233 (D.D.C. 2014).

## B. Reallocation Authority

A cornerstone of Self-Governance under the ISDEAA is tribes' authority to

redesign programs and reallocate funding to best address the needs of their particular

communities.  Recognizing that tribal governments are better positioned to evaluate the

needs and priorities of their people than are federal officials, Congress gave tribes broad

redesign and reallocation authority:

> An Indian tribe may redesign or consolidate programs, services, functions,
> and activities (or portions thereof) included in a funding agreement
> under section 5385 of this title and reallocate or redirect funds for such

programs, services, functions, and activities (or portions thereof) in any manner which the Indian tribe deems to be in the best interest of the health and welfare of the Indian community being served, only if the redesign or consolidation does not have the effect of denying eligibility for services to population groups otherwise eligible to be served under applicable Federal law.

25 U.S.C. § 5386(e).  Significantly, the provision includes no right of agency review.

The Title V regulations echo the statute, with the only limitation on the reallocation authority being that it must not have the effect of denying eligibility for services to population groups otherwise eligible to be served.  42 C.F.R. § 137.185.

The Tribe's Compact with the United States also echoes the statute, stating that the Tribe may "reallocate or redirect funds . . . in any manner which the [Tribe] deems to be in the best interest of the health and welfare of the Indian community being served."  Title V Compact of Self-Governance Between the Seminole Tribe of Florida and the United States Department of Health and Human Services, Indian Health Service, Art. III, § 4.

In sum, neither the ISDEAA and its regulations nor the Compact grant IHS any right to review or (dis)approve the Tribe's reallocation decisions, nor do they impose any other limitation or restriction on the reallocation authority, outside of the narrow exception for denial of service to otherwise eligible populations.

## C.  Contract Support Costs

The ISDEAA mandates that, in addition to the Secretarial or 106(a)(1) amount, IHS must include a second type of funding:

-5-

**(2)**  There shall be added to the amount required by paragraph (1) contract
support costs which shall consist of an amount for the reasonable costs for
activities which must be carried on by a tribal organization as a contractor
to ensure compliance with the terms of the contract and prudent
management, but which --
 **(A)**  normally are not carried on by the respective Secretary in his
direct operation of the program; or
 **(B)**  are provided by the Secretary in support of the contracted
program from resources other than those under contract.

25 U.S.C. § 5325(a)(2).  This dispute involves funding for indirect CSC, the

administrative and overhead expenses associated with carrying out the Tribe's health care

program.  *See* 25 U.S.C. § 5325(a)(3)(A)(ii).

The U.S. Supreme Court has held—twice—that the ISDEAA requires full

payment of CSC.  *Salazar v. Ramah Navajo Chapter*, 567 U.S. 182, 185 (2012) ("[W]e

hold that the Government must pay each tribe's contract support costs in full.");

*Cherokee Nation v. Leavitt*, 543 U.S. 631, 634 (2005) ("The [ISDEAA] specifies that the

Government must pay a tribe's costs, including administrative expenses.").

Congress funds CSC through a separate, indefinite appropriation—"such sums as

may be necessary."  Consolidated Appropriations Act, 2018, Pub. L. No. 115-141 (March

23, 2018).  Therefore increasing the amount of CSC paid to the Tribe will not reduce the

amount of funding available to IHS or to any other tribe.

For the Tribe, as for most tribes, the full amount of indirect CSC is determined by

multiplying a negotiated indirect cost rate by the amount of the direct cost base.  The

Tribe's 2017 indirect cost rate agreement with the Department of the Interior's Interior

Business Center, which applies government-wide and remains in effect for FY 2018, calls

for an indirect cost rate of 28.32% on a direct cost base comprised of "[t]otal direct

salaries and wages, <u>including</u> fringe benefits."  Exh. C at 1 (emphasis in original).

IHS accepts the Tribe's rate, as it must.  The controversy is over the amount of the direct cost base.  Specifically, the issue is whether IHS may impose an arbitrary 80% cap on the allocation of funding to salaries, wages, and fringe for the calculation of CSC need, or whether the Tribe may allocate as much as it determines to be in the best interest of the health and welfare of the tribal community.

### D.  Procedural History:  The Final Offer and the IHS Response

Throughout the summer of 2017, the parties conducted negotiations on the FY 2018 funding agreement, including an in-person meeting in Nashville on August 31.  The parties were able to reach agreement on all terms except one: the amount of indirect CSC the Tribe was entitled to be paid.

With negotiations on this issue at an impasse, the Tribe submitted a final offer in accordance with the ISDEAA.  *See* Exh. A.  Although the final offer letter is dated October 30, 2017, the Tribe did not send the letter until January 4, 2018.  In the final offer, the Tribe proposed a direct cost base of $7,301,116, which represents 98.93% of the total IHS direct cost funding of $7,379,916.

In a letter dated February 16, 2018, IHS rejected the Tribe's final offer in part, approving a direct cost base of 80% of total funding but denying the additional 18.93%, costing the Tribe $159,483 in indirect CSC.  *See* Exh. B at 8–9.  IHS argues that only the 106(a)(1) or "Secretarial" amount transferred by IHS generates CSC.  The Secretarial amount is the amount the Secretary would have spent on the programs had they not been compacted by the Tribe.  IHS acknowledges that the Tribe is free to expand the health program by supplementing IHS funding with tribal funding, third-party revenues, and

other funding.  But IHS will not pay CSC on the expanded, non-federal portion of the

program, only on the Secretarial amount.

IHS recognizes the reallocation authority, but it argues it has limits—at least

when it comes to the calculation of CSC.  The Tribe's proposal to spend 98.93% of its

IHS funding on salaries, wages, and fringe would leave less than $90,000 from the

Secretarial amount to cover all the other expenses necessary to carry out the agreement,

such as supplies, utilities, and Purchased/Referred Care.  This is not reasonable,

according to IHS, despite the fact that the Tribe is willing and able to cover these

additional expenses with its own funds and, to a lesser extent, third-party revenues.

Thus, while the Tribe is free to reallocate all its funding to salaries, for the

purpose of CSC calculation IHS will only use an "equitable, *pro rata* share" of salaries,

wages, and fringe as the direct cost base.  Exh. B at 7, 8.  That equitable share happens to

be 80% of total IHS funding.  IHS rejects the additional direct cost base amount the Tribe

proposed, along with the $159,483 in indirect CSC those additional direct costs would

have generated.  *Id*. at 8–9.

On April 5, 2018, the Tribe filed this action challenging IHS's decision.

## STANDARD OF REVIEW

### A.  Summary Judgment

Summary judgment shall be granted "if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a); *see also Arrington v. United States*, 473 F.3d

329, 333 (D.C. Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247

(1986)).  The movant bears the initial burden of identifying those portions of the

pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any, which it believes demonstrate the absence of a genuine issue

of material fact.  Fed. R. Civ. P. 56(c); *Roth v. U.S. Dep't of Justice,* 642 F.3d 1161,

1179 (D.C. Cir. 2011) (*citing Celotex Corp. v. Catrett, 477* U.S. 317, 323 (1986)).

However, "[t]he mere existence of *some* alleged factual dispute between the

parties will not defeat an otherwise properly supported motion for summary judgment;

the requirement is that there be no *genuine* issue of *material* fact."  *Theodus v.

McLaughlin,* 852 F.2d 1380, 1382 (D.C. Cir. 1988) (*citing Anderson,* 477 U.S. at 247–

48) (emphasis in original; internal quote marks omitted).  A material fact is one that

"might affect the outcome of the suit under governing law."  *Hendricks v. Geithner,*

568 F.3d 1008, 1012 (D.C. Cir. 2009) (*citing Anderson,* 477 U.S. at 248–51).  In ruling

on a motion for summary judgment, the court must draw all justifiable inferences in

the nonmoving party's favor and accept the nonmoving party's evidence as true.

*Anderson*, 477 U.S. at 255.  A nonmoving party, however, must establish more than

"[t]he mere existence of a scintilla of evidence" in support of its position.  *Id*. at 252.

Rather, the nonmoving party must present specific facts that would enable a reasonable

jury to find in its favor.  If the evidence "is merely colorable, or is not significantly

probative, summary judgment may be granted."  *Anderson,* 477 U.S. at 249–50

(citations omitted).

**B.  Review of Agency Action Under the ISDEAA**

This Court has joined others in determining that a *de novo* standard of review

applies to an appeal of an agency rejection decision under the ISDEAA.  *Pyramid Lake

Paiute Tribe v. Burwell*, 70 F. Supp. 3d 534, 541–42 (D.D.C. 2014); *Seneca Nation of*

*Indians v. U.S. Dep't of Health and Human Services*, 945 F. Supp. 2d 135, 141–42

(D.D.C. 2013).  *See also Cheyenne River Sioux Tribe v. Kempthorne*, 496 F. Supp. 2d

1059, 1066–67 (D.S.D. 2007); *Cherokee Nation of Okla. v. U.S.*, 190 F. Supp. 2d 1248,

1258 (E.D. Okla. 2001), *rev'd on other grounds by Cherokee Nation v. Leavitt*, 543 U.S.

631 (2005); *Shoshone-Bannock Tribes of the Fort Hall Reservation v. Shalala*, 988 F.

Supp. 1306, 1318 (D. Or. 1997).  Thus, the more deferential standard that often applies to

review of agency action under the Administrative Procedure Act ("APA"), 5 U.S.C. §

706, is not appropriate where, as here, a tribe or tribal organizations brings claims solely

under the ISDEAA.  *Compare Citizen Potawatomi Nation v. Salazar*, 624 F. Supp. 2d

103 (D.D.C. 2009) (applying APA "arbitrary and capricious" standard of review where

Indian tribe sought relief primarily under APA, with secondary claim based on ISDEAA)

*with Seneca Nation*, 945 F. Supp. 2d at 142 (D.D.C. 2013) (applying *de novo* review and

distinguishing *Citizen Potawatomi* in part on grounds *Seneca Nation* involved only

ISDEAA claims).

        *De novo* review comports with Congress's intent to reign in the agencies'

"bureaucratic recalcitrance":  "The strong remedies provided in these amendments are

required because of those agencies' consistent failures over the past decade to

administer self-determination contracts in conformity with the law.  Self-

determination contractors' rights under the Act have been systematically violated  . . .

."  *Shoshone-Bannock Tribes*, 988 F. Supp. at 1315–16 (*citing* S. Rep. No. 100–274, at

7–8 (1987), *reprinted in* 1988 U.S.C.C.A.N. 2619).

### C.  Statutory Interpretation Under the ISDEAA

For the same reasons, an agency's interpretation of statutory provisions of the ISDEAA is not entitled to deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  *Pyramid Lake Paiute Tribe*, 70 F. Supp. 3d at 542.  In this Circuit, *Chevron*-type deference is not applied where "[t]he governing cannon of construction requires that 'statutes are to be construed liberally in favor of Indians, with ambiguous provisions interpreted to their benefit.'"  *Cobell v. Norton*, 240 F.3d 1081, 1101 (D.C. Cir. 2001) (quoting *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985)).  *See also S. Ute Indian Tribe v. Sebelius*, 657 F.3d 1071, 1078 (10th Cir. 2011) ("If the ISD[EA]A can reasonably be construed as the Tribe would have it construed, it must be construed that way.  This canon of construction controls over more general rules of deference to an agency's interpretation of an ambiguous statute.") (quotation and citation omitted); *Tunica-Biloxi Tribe of La. v. United States*, 577 F. Supp. 2d 382, 421 (D.D.C. 2008) (same) (quoting *Muscogee (Creek) Nation v. Hodel*, 851 F.2d 1439,1445 (D.C. Cir. 1988)).

This canon of statutory construction is explicitly included in Title V of the ISDEAA, which provides the statutory basis for the Tribe's self-governance compact and funding agreement with IHS:

> Each provision of [Title V] and each provision of a compact or funding agreement shall be liberally construed for the benefit of the Indian tribe participating in self-governance and any ambiguity shall be resolved in favor of the Indian tribe.

25 U.S.C. § 5392(f).  As the U.S. Supreme Court wrote of a very similar rule of construction in Title I, when interpreting the ISDEAA, "[t]he Government, in effect, must

demonstrate that its reading is clearly required by the statutory language." *Salazar v. Ramah Navajo Chapter*, 567 U.S. 182, 194 (2012).

## SUMMARY OF ARGUMENT

The Secretary cannot meet his burden of "demonstrating by clear and convincing evidence the validity of the grounds for rejecting the [Tribe's final] offer." 25 U.S.C. § 5387(d). IHS rejected the Tribe's final offer on the grounds that the funding amount requested was greater than the amount to which the Tribe is entitled under the ISDEAA. Exh. B at 5 (citing 25 U.S.C. § 5387(c)(1)(A)(i)). But this conclusion depends on application of an arbitrary salary cap that is contrary to the ISDEAA.

A fundamental tenet of tribal self-governance under the ISDEAA is that a tribe need not spend its funding in the same way as IHS does. The Tribe has proposed to reallocate funding that the Secretary would have used for non-salaries and instead use that funding for salaries—which happens to increase its CSC funding by expanding the direct cost base. The ISDEAA expressly allows the Tribe to reallocate funds as it sees fit. 25 U.S.C. § 5386(e). IHS seeks to impose an arbitrary 80% cap on the reallocation authority when it comes to salaries in order to limit the Tribe's direct cost base and thus its indirect CSC funding. But neither the statute nor any other IHS regulation or policy contains such limitation, nor any exception for CSC calculations. To use the terms of the statutory final offer criteria, IHS fails to produce "a controlling legal authority"—or any legal authority at all—justifying the salary cap and the denial of the Tribe's offer.

## ARGUMENT

### I.   The ISDEAA Allows Tribes to Allocate Funding to Best Serve the Needs of the Tribal Community

The Tribe has proposed to reallocate funding that the Secretary would have used for non-salary purposes and instead use that funding for salaries—which happens to increase its CSC funding by expanding the direct cost base.  The ISDEAA is clear about the Tribe's right to reallocate funding:

> An Indian tribe may redesign or consolidate programs, services, functions, and activities (or portions thereof) included in a funding agreement under section 5385 of this title and reallocate or redirect funds for such programs, services, functions, and activities (or portions thereof) in any manner which the Indian tribe deems to be in the best interest of the health and welfare of the Indian community being served, only if the redesign or consolidation does not have the effect of denying eligibility for services to population groups otherwise eligible to be served under applicable Federal law.

25 U.S.C. § 5386(e).  The statute contains no 80% limitation, no exception for CSC calculation, and no requirement that the agency review or approve a tribe's reallocation. IHS did not argue that the Tribe's reallocation would effectively deny eligibility of otherwise eligible groups for services, as that is clearly not the case here.

As discussed above, the Title V regulations echo the statute and include no restriction or limitation other than that the reallocation must not effectively deny services to otherwise eligible groups.  *See* 42 C.F.R. § 137.185.  The Tribe's Compact includes a substantially identical provision, with no additional restrictions or limitations.  Compact, Art. III, § 4.

Not even IHS's CSC Policy, published in Part 6, Chapter 3 of the Indian Health Manual ("IHM"), purports to impose an 80% salary cap or in any other way limit tribes' right to reallocate funding.  If it did, that provision would be invalid, as the policy specifically states that, "[i]n the event of any apparent conflict, the ISDEAA supersedes this chapter."  IHM, § 6-3.1C. *available at* https://www.ihs.gov/ihm/pc/part-6/p6c3/.

By law and by contract, the Tribe is authorized to reallocate funding from non-salary functions and activities to salaries. IHS's decision denying the Tribe's reallocation, and thus the Tribe's final offer, is contrary to the ISDEAA.

## II. IHS's Arguments for Limiting the Tribe's Reallocation Authority Have No Basis in Law or Policy

In its decision letter, IHS attempts to circumvent the plain language of the statute, regulations, and Compact by arguing that (A) expending more than 80% of funding on salaries would constitute an "expansion" of the federal program for which IHS need not pay CSC; (B) expending more than 80% of funding on salaries would be unreasonable given the other costs necessary for prudent management of the contract; and (C) IHS need pay CSC only on "an equitable, *pro rata* share" of salaries and benefits. None of these arguments meets the high bar of the final offer rejection criteria.

### A. Expending More Funding on Salaries than IHS Does Is Not an "Expansion" of the Program

IHS argues that only the 106(a)(1) or "Secretarial" amount transferred by IHS generates CSC. Exh. B at 5–6. The Secretarial amount is the amount the Secretary would have spent on the programs had they not been compacted by the Tribe. The Tribe is free to expand the health program by supplementing IHS funding with tribal funding, third-party revenues, and other funding. But, IHS concludes, the agency need not pay CSC on the expanded, non-federal portion of the program, only on the Secretarial amount. Exh. B at 6.

But this argument depends on a narrow definition of the Secretarial amount that courts, including this one, have rejected. The Secretarial amount includes *all* funding the Secretary would otherwise have used to provide the services, not just funds appropriated

by Congress.  For example, IHS, when providing direct services, bills and collects from

third-party payors such as Medicare, Medicaid, and private insurers, and uses these funds

to provide further services.  *See, e.g.*, 25 U.S.C. § 1641(c); 42 U.S.C. § 1396j.  Tribes are

required by law and contract to do the same, and they must use this "program income" to

further the purposes of their ISDEAA agreements.  25 U.S.C. § 5388(j).  At least one

court has held that such third-party revenues used by a tribe to provide services under its

ISDEAA agreement are part of the Secretarial amount and generate CSC just like IHS-

appropriated funds.  *Navajo Health Foundation—Sage Memorial Hospital, Inc. v.

Burwell*, 263 F. Supp. 3d 1083, 1162–68 (D.N.M. 2016) (currently on appeal).  The

statute says that the Secretarial amount is not less than "[t]he amount of funds" the

Secretary would have otherwise provided—not "the amount of appropriated funds" the

Secretary would have otherwise provided.  As Judge Cooper of this court put it in another

case involving third-party funding, "the applicable funding level for a contract proposal

under [the ISDEAA] is determined based on what the Secretary otherwise would have

spent, not on the source of the funds the Secretary uses."  *Pyramid Lake Paiute Tribe v.

Burwell*, 70 F. Supp. 3d 534, 544 (D.D.C. 2014).

Further, this case presents an easier question than does *Sage Memorial*.  Here, the

Tribe proposed to recover CSC in support of *IHS-appropriated* funding, not tribal or

third-party funding.  The Tribe has simply proposed to reallocate appropriated funds that

the Secretary would have used for non-salaries and instead use that funding for salaries.

Thus IHS's argument that the Secretarial amount "must be circumscribed by the annual

appropriations that would have been used for the operation of the PFSAs," Exh. B at 6, is

not only wrong but irrelevant here.  The funding proposed for reallocation by the Tribe

*was* part of the annual appropriations used for the operation of the PFSAs, and it still would be so used.  It would merely be repurposed as authorized by the ISDEAA.

IHS cites the 1996 *Ramah Navajo School Board* decision for the proposition that the Secretarial amount "must be circumscribed by the annual appropriations that would have been used for the operation of the PFSAs."  Exh. B at 6.  Even if that is so—and the *Pyramid Lake* and *Sage Memorial* decisions indicate it is not—the Tribe here does not seek to expand the Secretarial amount by adding any funding beyond the IHS-appropriated funds.  In fact, the IHS decision letter acknowledges that "the Tribe is not contesting the appropriate Secretarial amount." *Id*.  The issue is how much of the Secretarial amount can be reallocated to salaries.  The Tribe, relying on the plain language of Title V, maintains that it all can.  To defend its 80% cap, IHS must argue that the Tribe's reallocation to salaries of funding IHS would have used for other things creates, in effect, a "separate or supplemented program" that does not generate CSC—even though these are all IHS funds.

Unsurprisingly, this counterintuitive argument is not supported by the cases IHS cites.  For example, the *Ramah Navajo School Board* case was a resounding tribal victory in a challenge to a Department of the Interior policy that sought to penalize tribes 50% of their CSC funding if they failed to turn in their indirect cost rate proposal by an agency-imposed deadline.  The court rejected Interior's "audacious" argument that it had unfettered authority to allocate CSC in any way it saw fit.  *Ramah Navajo Sch. Bd. v Babbitt*, 87 F. 3d 1338, 1345 (D.C. Cir. 1996).  The court did endorse the CSC spending caps imposed by the appropriations act, stating that "the Secretary need only distribute the amount of money appropriated by Congress under the Act" and need not reallocate

program funds to cover CSC shortfalls.  *Id*.  But those statutory caps were very different

than the 80% cap that IHS proposes here, which has no statutory or regulatory basis.[3]  In

fact, IHS's 80% cap is much more like the 50% administrative penalty struck down in

*Ramah Navajo School Board*.  Both attempt to reduce CSC payments through the use of

purported agency discretion untethered from the statute.

Similarly, IHS cites the *Tunica-Biloxi* decision to support its argument that IHS

need pay only its "*pro rata* share" of indirect costs, not CSC to support "expanded

separate or supplemented programs."  Exh. B at 6.  But again, the Tribe's proposal to

allocate 98.93% *of its IHS funding* to salaries does not seek CSC on any separate or

supplemental funding.  The *Tunica-Biloxi* case involved a very different set of legal and

factual issues.  Tunica-Biloxi argued that the inclusion in the direct cost base of funding

from agencies that did not pay add-on indirect costs produced indirect cost "rate dilution"

that illegally lowered IHS's CSC obligation.  The court held that the ISDEAA does not

require IHS to pay any indirect costs allocable to the other agency, only the indirect costs

"associated with" or allocable on a *pro rata* basis to the IHS.[4]  This is very different from

saying, as IHS seems to suggest, that salaries paid with IHS's own appropriated funds are

---

[3] Moreover, the U.S. Supreme Court ultimately held (in a different *Ramah* case) that even
the appropriations act caps did not protect the United States from liability for the full
amount of CSC owed.  *Salazar v. Ramah Navajo Chapter*, 567 U.S. 182 (2012) (holding
appropriations caps do not relieve federal government from obligation to pay each tribe's
CSC in full).  Thus IHS's reliance on *Ramah Navajo School Board*, and cases citing it,
for the same proposition is puzzling.
[4] *Tunica-Biloxi Tribe of La. v. United States*, 577 F. Supp. 2d 382, 419-423 (2008).

somehow associated with or allocable to another agency.  This Court should decline that suggestion.[5]

### B.  Expending More than 80% on Salaries Would Not Be Unreasonable Here, Where the Tribe has Other Funds Available to Cover Non-Salary Costs

To escape the conclusions above, IHS argues that the Tribe has *in effect* expanded the federal base of the program by contributing its own funds and third-party revenues to cover costs such as supplies, utilities, and Purchased/Referred Care (services contracted from third-party providers).  Exh. B at 7–8.  It claims that "[t]his inappropriately shifts expenses to the IHS for purposes of calculating indirect CSC, even though those expenses are not IHS-funded, and would yield the illegal result of requiring the IHS to fund CSC beyond the amounts associated with the Federal PFSAs."  *Id.* at 8.  But there is nothing illegal in the Tribe supplementing the program with tribal and third-party funds, as IHS acknowledges, and the Tribe did not ask IHS to pay CSC associated with these funds— even though arguably it could have, at least in the case of third-party revenues (see discussion of *Sage Memorial* above).  All of the funding the Tribe proposes to use for salaries, and thus include in the direct cost base, are IHS dollars associated with the federal PFSAs.  The Secretary would not have used as many of these dollars on salaries as the Tribe proposed, but he would have used them all for something.  It is not unreasonable for the Tribe to allocate the lion's share of its IHS funding to salaries, when the Tribe has funds available from program income and tribal funds to cover the other

---

[5] *Tunica-Biloxi* has also been called into question recently by the *Sage Memorial* decision, in which the United States relied on *Tunica* for its argument on the allocation of costs for CSC purposes.  *Navajo Health Foundation—Sage Memorial Hospital v. Burwell*, 263 F. Supp. 3d 1083, 1097 (D.N.M. 2016).  The court, however, ruled in favor of the Sage Memorial hospital, although it did not explicitly repudiate *Tunica-Biloxi*.

costs of carrying out the agreement.  On the contrary, the Tribe has determined that doing so is in the best interests of the community.

### C.  The 80% Cap is Arbitrary, Not "An Equitable *Pro Rata* Share" of Salaries as IHS Argues

Having left the statute far behind, IHS ultimately grounds its 80% salary cap on its arbitrary perceptions of reasonableness and equity.  IHS says that, when providing direct services, it spends 71% of its appropriated funds on salaries.  While the Tribe is not locked into this figure due to the ISDEAA reallocation authority, for the purpose of calculating CSC needs, "IHS must apply an equitable, *pro rata* share of salaries and benefits to the IHS-funded program and to the tribally-supplemented program, and calculate indirect CSC using only the salaries and benefits attributed to the IHS-funded program."  Exh. B at 7 (citing 25 U.S.C. § 5326 and *Tunica-Biloxi Tribe of La. v. United States*, 577 F. Supp. 2d 382, 418 (2008)).  This equitable share happens to equate to 80% of total IHS funding.  *Id*.

It is not clear from the decision letter how IHS arrived at 80%, nor does there appear to be any principled reason why that figure is more equitable than any other.  Ironically, IHS acknowledges that "last year's direct cost base reach[ed] 83 percent of the total Secretarial amount."  Exh. B at 7.  If IHS's ratio of 71% is not required, and 83% is acceptable, from where does IHS derive the 80% rule?  The decision letter tries to ascribe it to past practice, but the explanation is puzzling.  The decision letter says that, in FY 2014, IHS and the Tribe agreed to use "80 percent of total salaries and benefits (for the entire health program—which includes funding added by the Tribe and third party revenues—and not just the IHS program transferred to the Tribe) as the direct cost base for purposes of indirect CSC calculations."  Exh. B at 7.  But the Tribe's "entire health

program" in FY 2014 was about $75 million, and 80% of that would be $60 million, far more than 100% of IHS's total payments to the Tribe that year and over eight times the $7,301,116 the Tribe proposed as its FY 2018 direct cost base.

In any event, there is no more authority in the ISDEAA for the 80% cap than there is for the general proposition that IHS need pay CSC only on what it arbitrarily considers "an equitable, *pro rata* share" of salaries and benefits. Certainly the decision letter adduces no "clear and convincing evidence" for rejecting the Tribe's offer, *see* 25 U.S.C. § 5387(d), giving rise to the remedy described next.

## III. Since IHS Failed to Meet its Burden for Rejecting the Tribe's Final Offer, This Court Should Issue an Order Directing IHS to Approve and Fund the Contract as Proposed

Pursuant to the Title V final offer provisions, 25 U.S.C. § 5387(c)(1)(A), if the Secretary rejects a final offer, he must do so on the basis of one of the four listed rejection criteria.  If none of the statutory rejection criteria applies, the Secretary must approve the final offer.  *Id*.  The Secretary bears the burden of demonstrating, by clear and convincing evidence, that the grounds for rejecting a final offer are valid.  25 U.S.C. § 5387(d).

Though IHS asserted in its February 16, 2018 letter that "the amount of funds proposed in the final offer exceeds the applicable funding level to which the Indian tribe is entitled under this part" (the first of the listed rejection criteria under 25 U.S.C. § 5387(c)(1)(A)(i)), that determination was contrary to the ISDEAA and cannot be sustained on appeal.  Moreover, IHS did not assert in the rejection letter that any of the remaining criteria applied.  In the absence of any applicable rejection criterion, the Secretary was required to approve the Tribe's final offer.

This Court is explicitly authorized under the ISDEAA to:

> order appropriate relief including money damages, injunctive relief against any action by an officer of the United States or any agency thereof contrary to this subchapter or regulations promulgated thereunder, or mandamus to compel an officer or employee of the United States, or any agency thereof, to perform a duty provided under this subchapter or regulations promulgated hereunder (including immediate injunctive relief to reverse a declination finding under section 5321(a)(2) of this title or to compel the Secretary to award and fund an approved self-determination contract).

25 U.S.C. § 5331(a).  *See also* 25 U.S.C. § 5391(a) ("For the purposes of section 5331 of this title, the term 'contract' shall include compacts and funding agreements entered into under this part.").  Since IHS failed to identify the existence of any legitimate statutory grounds for rejecting the Tribe's final offer with respect to indirect CSC for FY 2018, mandamus and injunctive relief are appropriate to compel the Secretary to award and fund the final offer as part of the Tribe's funding agreement.[6]

### CONCLUSION

The Secretary's rejection of the Tribe's final offer proposal was contrary to the ISDEAA, and the Secretary cannot meet his burden of clearly demonstrating that his grounds for rejecting the Tribe's final offer are valid.  Therefore, the Tribe respectfully

---

[6] Because the ISDEAA specifically authorizes such relief against "any action" contrary to the ISDEAA, The Tribe need not demonstrate that it meets each factor under the traditional test for equitable, common-law injunctions (irreparable injury, no adequate remedy at law, balance of hardships, and public interest).  *See, e.g.*, *FTC v. H.J. Heinz Co.*, 246 F. 3d 708, 714 (D.C. Cir. 2001); *Susanville Indian Rancheria v. Leavitt*, 2008 WL 58951 at *10–11 (E.D. Cal. 2008) (enjoining IHS from rejecting tribe's final offer and requiring IHS to fund ISDEAA agreement without restrictions); *Crownpoint Inst. of Tech. v. Norton*, 2005 U.S. Dist. LEXIS 48399 at *37 (D.N.M. 2005) ("The specific mandamus relief authorized by ISD[EA]A relieves [the plaintiff tribal organization] of proving the usual equitable elements including irreparable injury and absence of an adequate remedy at law.").

requests that this Court grant the accompanying Motion for Summary Judgment in favor

of the Tribe.


Respectfully submitted,

 s/ Kaitlyn Klass_____
Kaitlyn Klass (DC Bar No. 1032219)
Hobbs, Straus, Dean, & Walker LLP
2120 L St. NW, Suite 700
Washington, DC  20037
202-822-8282 (Tel.)
202-296-8834 (Fax)

Geoffrey D. Strommer, *pro hac vice*
Stephen D. Osborne, *pro hac vice*
Hobbs, Straus, Dean & Walker, LLP
516 SE Morrison St., Suite 1200
Portland, OR 97214
503-242-1745 (Tel.)
503-242-1072 (Fax)

Attorneys for the Seminole Tribe of Florida

DATED:  June 14, 2018

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**SEMINOLE TRIBE OF FLORIDA**    )
    )
    PLAINTIFF,    )
    )
    v.    )    Case No. 1:18-cv-00776-RC
    )
**ALEX M. AZAR**, in his official capacity    )
as Secretary,    )
U.S. Department of Health & Human Services,    )
    )    **STATEMENT OF**
**RADM MICHAEL D. WEAHKEE**, in his    )    **MATERIAL FACTS**
official capacity as Acting Director,    )
Indian Health Service    )
    )
    DEFENDANTS.    )

## STATEMENT OF MATERIAL FACTS

Pursuant to LCvR 7(h), Plaintiff Seminole Tribe of Florida submits this Statement of Material Facts to which Plaintiff contends there is no genuine dispute:

1.    Plaintiff Seminole Tribe of Florida (the "Tribe") is a federally recognized tribe. Dep't of the Interior, *Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs*, 82 FED. REG. 4915, 4918 (Jan. 17, 2017).  The Tribe operates health facilities and provides health care services to its members and other beneficiaries pursuant to its self-governance compact and funding agreements with the Indian Health Service ("IHS") under Title V of the Indian Self-Determination and Education Assistance Act ("ISDEAA"), 25 U.S.C. § 5381 et seq.  Complaint, ¶ 5; Exh. B.

2.    The ISDEAA and the compact and funding agreements require IHS to pay the Tribe two types of funding: (1) the "Secretarial" or program amount under section 106(a)(1), 25

U.S.C. § 5325(a)(1); and (2) contract support costs ("CSC"), the reasonable overhead and administrative costs associated with carrying out the agreements, *see* 25 U.S.C. § 5325(a)(2), (3), (5), & (6).

3.      The amount of the indirect CSC requirement is calculated by multiplying the Tribe's indirect cost rate, negotiated with the Interior Business Center in the Department of the Interior, by the Tribe's direct cost base.  Exh. B at 5 (citing Indian Health Manual, § 6-3.2(E)(1)); Exh. C (indirect cost rate agreement).  The Tribe's FY 2017 rate agreement, which remains applicable in FY 2018, calls for a rate of 28.32% and defines the base as follows: "Total direct salaries and wages, <u>including</u> fringe benefits."  Exh. C at 1 (emphasis in original).  The indirect cost rate agreement applies to all agencies of the Federal Government.  *Id*.

4.      During negotiations on the FY 2018 funding agreement, the parties were unable to agree on the amount of the indirect CSC requirement.  Exh. B at 1.  The Tribe proposed to allocate 98.93% of the total IHS funding to salaries, wages, and fringe, thereby increasing its direct cost base and thus its indirect CSC entitlement.  Complaint, ¶ 2; Exh. B at 7.

5.      IHS expends 71% of its total funding on salaries and fringe benefits.  Exh. B at 8.  In previous years, IHS had allowed the Tribe to allocate 80% to salaries, wages, and fringe, and up to 83% in FY 2017.  Exh. B at 7.

6.      In an attempt to resolve the issue, the Tribe presented a final offer, in accordance with 25 U.S.C. § 5387(b), in a letter dated October 30, 2017 but received by IHS on January 4, 2018.  Complaint, ¶ 32; Exh. A (final offer letter); Exh. B at 1 & n.2.  Of the total available IHS direct cost funding of $7,379,916, the Tribe proposed to spend 98.93%, or $7,301,116, on salaries, wages, and fringe.  Applying the Tribe's indirect cost rate of 28.32% yields a gross

-2-

indirect CSC need of $2,067,676.  Subtracting a credit to IHS for indirect-cost funding of $167,409 contained within the Secretarial amount, the Tribe's proposed net indirect CSC need was $1,900,269.  Complaint, ¶ 32 and n.5; Exh. A at 2; Exh. B at 1-2.

       7.      On February 16, 2018, IHS issued a letter to Chairman Marcellus Osceola partially rejecting the Tribe's final offer. *See* Exh. B.  IHS invoked the criterion at 25 U.S.C. § 5387(c)(1)(A)(i), which says IHS may reject a final offer that "exceeds the applicable funding level to which the [Tribe] is entitled."

       8.      IHS rejected the Tribe's proposal to spend 98.93% of its $7,379,916 in IHS funding on salaries, wages, and fringe.  IHS approved the Tribe allocating 80% of funding to salaries, for a direct cost base of $6,655,712.  This results in an indirect CSC need of $1,740,786—a reduction of $159,483 from the amount proposed by the Tribe.  Exh. B at 8-9.

       9.      The Tribe filed this action challenging the IHS rejection on April 5, 2018.

DATED:  June 14, 2018            Respectfully submitted,

                                 /s/ Kaitlyn Klass
                                Kaitlyn Klass (DC Bar No. 1032219)
                                Hobbs, Straus, Dean & Walker, LLP
                                516 SE Morrison Street, Suite 1200
                                Portland, OR 97214
                                503-242-1745 (Tel.)
                                503-242-1072 (Fax)

                                Geoffrey D. Strommer, *pro hac vice pending*
                                Stephen D. Osborne, *pro hac vice pending*
                                Hobbs, Straus, Dean & Walker, LLP
                                516 SE Morrison Street, Suite 1200
                                Portland, OR 97214
                                503-242-1745 (Tel.)
                                503-242-1072 (Fax)

                                *Attorneys for Seminole Tribe of Florida*

-3-

**<u>CERTIFICATE OF SERVICE</u>**

I certify that a copy of this Motion and attachments will be sent to Defendants by United

States Postal Service Certified Mail, return receipt requested, at the following addresses:


Alex M. Azar
Secretary
U.S. Department of Health & Human
Services
General Counsel
200 Independence Ave, SW
Washington, DC 20201

The Honorable Jeff Sessions
Attorney General of the United States
Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC  20530-0001

RADM Michael D. Weahkee
Acting Director
Indian Health Service
5600 Fishers Lane
Rockville, MD 20857

The Honorable Jessie K. Liu
Attention:  Civil Process Clerk
United States Attorney for the District of
Columbia
Judiciary Center Building
555 Fourth Street, NW
Washington, DC 20530


By:    s/ Kaitlyn Klass
          Kaitlyn Klass