**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| SEMINOLE TRIBE OF FLORIDA, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 18-776 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 9, 14 |
| | : | | |
| ALEX M. AZAR, II, *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

**MEMORANDUM OPINION**

**DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; DENYING DEFENDANTS' CROSS-
MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

The Indian Self-Determination and Education Assistance Act ("ISDEAA"), 25 U.S.C.

§§ 5301–5423, authorizes the federal government and Indian tribes to enter into contracts that

permit the tribes to provide to their members federally funded services that the government

would have otherwise provided itself.  Pursuant to the ISDEAA, Plaintiff in this case, the

Seminole Tribe of Florida, has for years contracted with the Secretary of Health and Human

Services ("HHS") so that the Tribe may operate its own health program with federal dollars.  For

fiscal year 2018, the Tribe and the Secretary were able to reach an agreement on the vast

majority of federal funding that would be transferred to the Tribe in support of this health

program.  But the parties were not able to agree on one category of funds.  The Tribe therefore

brought this lawsuit, asking the Court to compel the Secretary to accept the Tribe's final offer.

Presently before the Court are the parties' cross-motions for summary judgment.  As explained

below, the Court denies both of these motions, because there remain significant factual issues

that the parties have not yet addressed.

## II.  BACKGROUND

### A.  Statutory and Regulatory Background

Congress passed the ISDEAA in 1975 in recognition of the right of Indian tribes to self-govern.  Pub. L. No. 93-638, § 3, 88 Stat. 2203, 2203–04 (1975); *see also* 25 U.S.C. § 5302(a).  The Act gives tribes the option of entering into "self-determination contracts" with the Secretary of HHS and the Secretary of Interior, under which the tribes become authorized to provide services to their members that otherwise would have been provided by the federal government—like education, law enforcement, or healthcare.  *See* 25 U.S.C. § 5321(a)(1).  Consistent with its broader purpose, the ISDEAA limits the government's discretion to deny tribes the ability to enter into a self-determination contract.  After a willing tribe submits "a proposal" for such a contract, the relevant Secretary must approve the proposal within ninety days, unless he "provides written notification to the applicant" of "a specific finding that clearly demonstrates that" at least one of five enumerated grounds for rejection applies.  *Id.* § 5321(a)(2).

Among those grounds for rejection is the Secretary's conclusion that "the amount of funds proposed under the" tribe's submission "is in excess of the applicable funding level for the contract."  *Id.* § 5321(a)(2)(D).  The "applicable funding level," the ISDEAA explains, is made up of two general categories of money.  The first category is what is often referred to as "the Secretarial amount," meaning the amount that "the appropriate Secretary would have otherwise provided for the operation of the programs . . . for the period covered by the contract."  *Id.* § 5325(a)(1).  By requiring that the federal government provide no less than this amount, the ISDEAA ensures that the tribes receive funding equal to what the government would have spent if it provided the services at issue itself.  *Id.*

On top of this base amount, however, the Secretary must also provide a second category of funds: "contract support costs" ("CSCs"). *Id.* § 5325(a)(2). These are "the reasonable costs for activities which must be carried on by a tribal organization as a contractor to ensure compliance with the terms of the contract and prudent management, but which . . . normally are not carried on by the respective Secretary in his direct operation of the program . . . or . . . are provided by the Secretary in support of the contracted program from resources other than those under contract." *Id.*

CSCs in turn comprise two sub-categories of funds. One is direct CSCs, which are, unsurprisingly, the "direct program expenses for the operation of the Federal program that is the subject of the contract," *id.* § 5325(a)(3)(A)(i), like unemployment taxes or workers compensation payments. The other category is indirect CSCs, which are "any additional administrative or other expense[s] related to the overhead incurred by the tribal contractor in connection with the operation of the Federal program," *id.* § 5325(a)(3)(A)(ii). Indirect CSCs generally make up the majority of CSCs; they can include expenses for facilities, equipment, auditing, and other financial management services. *See Cherokee Nation of Okla. v. Leavitt*, 543 US. 631, 635 (2005).

The ISDEAA provides no specific procedure for determining the amount of indirect CSCs a tribal contractor will incur related to a particular program in a given year. The Act merely states, as noted above, that the costs must be "reasonable . . . to ensure compliance with the terms of the contract and prudent management," 25 U.S.C. § 5325(a)(2), and that they cannot duplicate any funding already included in the Secretarial amount, *id.* § 5325(3)(A). Normally, however, the CSC amount attributed to a particular program is calculated by applying an "indirect cost rate" to a base amount of funds already owed to the tribe. *See* 2 C.F.R. pt. 200,

app. VII, § C; *Cherokee Nation*, 543 U.S. at 635.  The same indirect cost rate is generally used across all of the tribal contractor's federal programs for two to four years, *see* 2 C.F.R. pt. 200, app. VII, §§ B.9, C.2.a, and it is determined through negotiations with the Interior Business Center ("IBC"), located within the Department of Interior.

These negotiations are generally guided by uniform cost principles issued by the Office of Management and Budget ("OMB") that are applicable to all federal awards to non-federal entities—not just to Indian tribes.  *See generally* 2 C.F.R. pt. 200; *see also* 2 C.F.R. § 200.100. Those principles instruct that the process begins by taking the tribe's total costs associated with all federal programs for a fiscal year and classifying them as either direct or indirect.  *See* 2 C.F.R. pt. 200, app. VII, §§ B.9, E.2.  The indirect costs are then divided by a "distribution base," which is usually either the total direct costs of all federal programs contracted to the tribe, or the total salaries and wages associated with all federal programs.  *See* 2 C.F.R. pt. 200, app. VII, § C.2.a, c.  The product of that division equation is the indirect cost rate—"the percentage which the total amount of allowable indirect costs bears to the base selected."  *Id.* § C.2.a.

Once the IBC and the tribal contractor agree on an indirect cost rate, they execute an "Indirect Cost Negotiation Agreement."  Pl.'s Mot. for Summ. J., Ex. C, ECF No. 9-3.  It is then presumed that the agreed-upon rate will be used to allocate indirect costs to all of the tribal organization's individual federal contracts—by multiplying the rate by the base amount attributable to the individual contract at issue.  *Id.*; 2 C.F.R. pt. 200, app. VII, § E.1.  Thus, if, for example, the rate was determined using a distribution base of total direct costs for all federal programs, the indirect CSCs for a particular program would be calculated by applying the rate to the total direct costs for that particular program.  *See* 2 C.F.R. pt. 200, app VII, §§ B.1, C.2.a. Because total direct costs are certain to be a larger amount than salaries and wages (which are

themselves a portion of total direct costs), indirect cost rates pegged to total direct costs are likely to be lower percentages than those pegged to salaries and wages.  But everything should roughly even out when the rate is multiplied by the corresponding base amount: For total direct cost rates, a relatively low rate would be applied to a relatively high base amount.  For salary and wage rates, a somewhat higher rate would be applied to a somewhat lower base amount.

A hypothetical example may make this easier to understand.  Take a fictional tribe with multiple federal contracts, which together represent $10 million in total direct costs, of which $8 million is spent on salaries and wages.  On top of these costs, the tribe also estimates $2 million in indirect costs associated with all of its federal programs.  To calculate the tribe's indirect cost rate, it would first choose the distribution base: either the total direct costs of $10 million or the salaries and wages amount of $8 million.  It would then divide the $2 million indirect costs number by the chosen distribution base.  So if the base was total direct costs, the resulting indirect cost rate would be 2 million divided by 10 million—.2, or 20 percent.  And if the base was salaries and wages, the rate would be 2 million divided by 8 million—.25, or 25 percent.

Once one of these rates has been calculated, it is then used to allocate the indirect costs across the fictional tribe's federal awards.  Assume that the tribe's federal health program has total direct costs of $5 million, of which $4 million are salaries and wages.  If the rate had been determined using total direct costs, the 20 percent number calculated above would be applied to $5 million, producing an indirect cost award for the health program of $1 million.  If, on the other hand, the rate had been determined using salaries and wages, the 25 percent number from above would be applied to $4 million, producing the same indirect cost award: $1 million.

Admittedly, this example involves round numbers and evenly distributed costs.  In practice, the methodology would rarely be this clean, and the ultimate indirect cost award could

vary slightly depending on whether the rate was pegged to total direct costs or salaries and wages. But, as the Court said earlier, the purpose of the methodology is to allocate indirect costs across awards in a *roughly even* manner—so that "each Federal award bear[s] a fair share of the indirect costs in *reasonable relation* to the benefits received from the costs." 2 C.F.R. pt. 200, app VII, § B.1 (emphasis added).

### B. Factual Background

This case arises out of a dispute over the amount of recoverable indirect CSCs related to a self-determination contract for healthcare services. Such contracts for health care services, as one might expect, fall within the purview of the Secretary of HHS and are overseen by the Indian Health Services ("IHS"), one of HHS's operating divisions. Plaintiff, the Seminole Tribe of Florida, has for years contracted with HHS and IHS to operate its own health program. For fiscal year 2018, the parties were able to agree on the Secretarial amount and the level of *direct* CSCs to be transferred to the Tribe to fund the program, but the parties could not reach an agreement on *indirect* CSCs.

Amidst this impasse, the Tribe submitted to IHS a formal "proposal for a self-determination contract" within the meaning of the ISDEAA. 25 U.S.C. § 5321(a)(2). This proposal included the parties' agreed-upon Secretarial amount of $7,389,718 and direct CSC amount of $939,724. *See* Pl.'s Mot. for Summ. J., Ex. A., ECF No. 9-1 at 7. It then indicated that the indirect CSC amount would be $1,900,269, which the Proposal explained was based on application of the indirect cost rate that the Tribe had negotiated with the IBC. That rate—28.32 percent—had been determined using a distribution base of salaries, wages, and fringe benefits, so the Tribe estimated its healthcare indirect CSCs by multiplying the total salaries, wages, and fringe benefits associated with its healthcare program by .2832.

Consistent with the ISDEAA's procedural requirements, IHS responded by rejecting the Tribe's proposal within the prescribed ninety-day period.  And also consistent with the Act, IHS based its decision on one of the five enumerated grounds for rejection—that being its belief that the Tribe's request was "in excess of the applicable funding level for the contract."  25 U.S.C. § 5321(a)(2)(D); *see also* Pl.'s Mot. for Summ. J., Ex. B at 2, ECF No. 9-2.  According to IHS, it had no issue using the 28.32 percent rate that the Tribe had negotiated for all of its federal contracts; the problem instead lied with the base amount that the Tribe proposed.  *See id.* at 6, 8.  As a formal matter, the Tribe was using the pot of funds it was supposed to: the salaries, wages, and fringe benefits associated with the federal health program.  But the Tribe had taken advantage of a provision of the ISDEAA that permitted it to "reallocate or redirect" its IHS funds "in any manner which [the Tribe] deem[ed] to be in the best interest of the health and welfare of the Indian community being served."  25 U.S.C. § 5386.  Pursuant to this authority, the Tribe had decided to reallocate the Secretarial amount such that 98.93 percent of the nearly $7.4 million would be spent on salaries, wages, and benefits.  Pl.'s Mot. for Summ. J., Ex. B at 8.  As the Tribe itself admits, it was able to do this only because it could afford to cover the remaining costs of the program with its own funds.  *See, e.g.*, Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Pl.'s Mot. for Summ. J.") at 1, ECF No. 9.

In its rejection letter, IHS stressed that "[f]or purposes other than CSC calculations, the Tribe may reallocate or redirect funds subject to the confines of the" ISDEAA.  Pl's Mot. for Summ. J., Ex. B. at 9.  For purposes of CSC calculations, however, the agency reasoned that the Tribe's reallocation had the effect of artificially inflating the base amount.  The Tribe had, in other words, used its reallocation authority to get the best of both worlds: it had made its base amount *resemble* total direct costs while keeping the higher indirect cost rate that had been

negotiated based on salaries and wages.  This, IHS said, "inappropriately shift[ed] expenses to . . . IHS for purposes of calculating indirect CSC"—because application of the higher rate to the inflated base meant that the indirect CSC amount had been determined using expenses that were effectively not IHS-funded.  *Id.* at 9.  According to IHS, this violated the ISDEAA's limitation that tribes recover only the indirect CSCs that constitute the "reasonable" costs "incurred . . . in connection with the operation of the Federal program . . . pursuant to the [self-determination] contract."  25 U.S.C. § 5325(a)(3)(A)(ii); *see also* Pl.'s Mot. for Summ. J., Ex. B at 7, 9.

As an alternative to the Tribe's proposal, IHS suggested that indirect CSCs be calculated by applying the Tribe's negotiated indirect cost rate to an *equitable proportion* of the Tribe's salaries, wages, and benefits.  Pl.'s Mot. for Summ. J., Ex. B at 8.  The agency explained that it normally "expends 71 percent of the total funding on salaries and fringe benefits when it directly operates a program."  *Id.* at 9.  Thus, the agency estimated that "approximately 71 percent of the funding transferred to the Tribe in its Secretarial amount represents the salaries and fringe associated with the" federal program, which in this case would make the base amount $5,246,700.  *Id.*  But "due to Tribe's unique circumstances and the parties' government-to-government negotiations," IHS said that it was willing to accept a higher base—determined by taking 80 percent of the total direct costs associated with the Tribe's federal program.  This approach yielded a base amount of $6,655,712, which, when multiplied by the 28.32 percent indirect cost rate, produced an indirect CSC amount of $1,740,786—$159,483 lower than the Tribe's proposal.[1]

---

[1] The observant mathematicians will notice that 28.32% of $6,655,712 is in fact roughly $1,884,897.  As far as the Court can tell, IHS's number of $1,740,786 was the product of subtracting a credit for indirect-cost funding that is contained within the Secretarial amount.  The use of such a credit is not an issue in this case.  *See* Compl. ¶ 32 n.5, ECF No. 1.  Indeed, the

Upon receipt of IHS's rejection letter, the Tribe opted to exercise its right under the ISDEAA to go straight to federal court. *See* 25 U.S.C. § 5321(b)(3) (providing that tribes may forego the opportunity to file an appeal with IHS and instead "exercise the option to initiate an action in a Federal district court and proceed directly to such court"); *id.* § 5331(a) (conferring district courts with jurisdiction "over any civil action or claim against the appropriate Secretary arising under" the ISDEAA); *id.* § 5391(a) (stating expressly that § 5331 applies to self-determination contracts for health services). The Tribe filed the instant complaint against the Secretary of HHS and the acting director of IHS asserting two counts: The first sought a declaration that IHS's approach of using an "equitable" portion of salaries, wages, and benefits was unlawful under the ISDEAA. The second requested injunctive or mandamus relief requiring IHS to fund indirect CSCs in the amount that the Tribe proposed. *See* Compl. ¶¶ 36–45, ECF No. 1. Before Defendants had even answered the complaint, the Tribe filed a motion for summary judgment on both counts. Defendants responded by filing their own cross-motion for summary judgment, in which they ask the Court to declare the Tribe's proposal as unlawful under the ISDEAA and affirm IHS's rejection of the proposal.

## III.  LEGAL STANDARD

Under the Administrative Procedure Act ("APA"), courts typically defer to agency adjudications unless the plaintiff demonstrates that the decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). The ISDEAA changes the landscape, however—as courts in this circuit have already recognized. *See, e.g.*, *Pyramid Lake Paiute Tribe v. Burwell*, 70 F. Supp. 3d 534, 541–42 (D.D.C. 2014);

---

Tribe's proposed amount similarly involved the subtraction of a credit that was contained within the Secretarial amount. *Id.* ¶ 32.

*Seneca Nation of Indians v. U.S. Dep't of Health and Human Servs.*, 945 F. Supp. 2d 135, 141–42, 142 n.5 (D.D.C. 2013).  Congress passed the Act with the "intent to circumscribe as tightly as possible the discretion of the Secretary."  *Ramah Navajo Sch. Bd. v. Babbitt*, 87 F.3d 1338, 1344 (D.C. Cir. 1996).  The Act provides that the Secretary has the "burden of demonstrating by clear and convincing evidence the validity of the grounds for rejecting [a tribe's] offer," 25 U.S.C. § 5387(d), and it prohibits the Secretary from promulgating regulations except in specific circumstances, *id.* § 5328(a).

Also relevant in this context is what courts have taken to calling the "Indian law canon of statutory construction," which counsels that "laws affecting Indians 'be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit.'"  *Pyramid Lake*, 70 F. Supp. 3d at 541–42 (quoting *Cobell v. Norton*, 240 F.3d 1081, 1101 (D.C. Cir. 2001)); *see also Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985).  Thus, "even where [an] ambiguous statute is entrusted to an agency," if the statute impacts Indians, courts "give the agency's interpretation 'careful consideration' but '[they] do not defer to it.'"  *Cobell*, 240 F.3d at 1101 (quoting *Muscogee (Creek) Nation v. Hodel*, 851 F.2d 1439, 1445 n.8 (D.C. Cir. 1988)).  If there were any doubt that the canon applies with full force in the context of ISDEAA cases, the Act itself puts the doubt to rest: The Act's model contract language expressly incorporates the canon—stating that every self-determination contract provision "shall be liberally construed to the benefit of the [tribal] Contractor."  25 U.S.C. § 5329(a)(2).

Taking all of this into account, courts usually apply a *de novo* standard of review when considering a tribe's challenge to an agency rejection under the ISDEAA.  *See, e.g.*, *Pyramid Lake*, 70 F. Supp. 3d at 542; *Seneca Nation*, 945 F. Supp. 2d 135, 141–42, 142 n.5.  The one exception appears to be cases where a tribe brings claims under both the ISDEAA and the APA.

*See Citizen Potawatomi Nation v. Salazar*, 624 F. Supp. 2d 103, 109 (D.D.C. 2009).  This exception is inapplicable here, though: the Seminole Tribe does not assert an APA claim.  The Court will thus perform a *de novo* review of IHS's partial rejection of the Tribe's proposal.

Of course, in performing its *de novo* review, the Court is guided by the familiar summary judgment standard, which provides that summary judgment is warranted only where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "When, as in this case, both parties file cross-motions for summary judgment, each must carry its own burden under the applicable legal standard."  *Ehrman v. United States*, 429 F. Supp. 2d 61, 67 (D.D.C. 2006).  "[N]either party waives the right to a full trial on the merits by filing its own motion; each side concedes that no material facts are at issue only for the purposes of its own motion."  *Hodes v. U.S. Dep't of Treasury*, 967 F. Supp. 2d 369, 373 (D.D.C. 2013) (quoting *Sherwood v. Wash. Post*, 871 F.2d 1144, 1147 n.4 (D.C. Cir. 1989)).  But although each party's motion is viewed separately, the Court may ultimately grant summary judgment "only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed."  *Cause of Action Inst. v. IRS*, 316 F. Supp. 3d 99, 105 (D.D.C. 2018).  And "despite the parties' stipulations that there are no disputed facts," the Court may still find that material facts are in dispute and, accordingly, deny both motions.  *Shea v. Kerry*, 961 F. Supp. 2d 17, 27 (D.D.C. 2013).

## IV.  ANALYSIS

As noted above, the Tribe's complaint in this case asserts two separate claims.  Count One focuses on IHS's offer to use eighty percent of total direct costs as the base for calculating indirect CSCs.  The Tribe asks that the Court declare that that approach is "contrary to the express terms of the ISDEAA and cannot serve as the basis for rejecting the Tribe's final offer."

Compl. ¶ 40.  Count Two, by contrast, focuses on the validity of the Tribe's proposal. According to the Tribe, the IHS's rejection letter did not establish that the proposal "exceed[ed] the applicable funding level to which the Tribe [was] entitled." *Id.* ¶ 43.  The Tribe therefore asks that the Court "'compel the Secretary to award and fund' the agreement as proposed." *Id.* ¶ 44 (quoting 25 U.S.C. § 5331(a)).

As the Tribe seems to see it, both of these claims turn on the same "straightforward issue of statutory interpretation: Does the ISDEAA allow IHS to arbitrarily limit the reallocation authority in § 5386(e) by imposing an 80% salary cap on the Tribe?"  Pl.'s Mot. for Summ. J at 1–2.  The answer to that question is no, the Tribe says, meaning IHS had no authority to reject the Tribe's indirect CSC proposal and offer its alternative calculation.

The Court sees things differently, however.  The Tribe's reallocation authority is not directly at issue here, as IHS has not attempted to prevent the Tribe from redirecting its federal funding.  Instead, the critical question is whether the Tribe's proposal for indirect CSCs exceeded "the applicable funding level for the contract."  25 U.S.C. § 5321(a)(2)(D).  And, as the Court will explain below, that is a fact-specific question.  The ISDEAA provides only general guidance on how indirect CSCs should be calculated, and conformity with the Act's standards turns on the particular circumstances of a given case.  Because the Court currently lacks significant information about the circumstances of this case, it denies both parties' motions for summary judgment.

## A.  The ISDEAA's Limit on Indirect CSC Funding

To evaluate the merits of both of the Tribe's claims, the Court begins by reviewing what the ISDEAA says about indirect CSCs—and then also what the Act does not say.  The Act defines CSCs as the "reasonable costs for activities which must be carried on by a tribal

organization as a contractor to ensure compliance with the terms of the contract and prudent management." 25 U.S.C. § 5325(a)(2).  It then defines indirect CSCs specifically as the "reasonable and allowable costs . . . related to the overhead incurred by the tribal contractor in connection with the operation of the Federal program, function, service, or activity pursuant to the contract."  *Id.* § 5325(a)(3)(A)(ii).  These definitions are limited, however, by a separate section of the ISDEAA, which provides that "funds available to the Indian Health Service" under the Act "may be expended only for costs . . . attributable to contracts, grants and compacts pursuant to the [ISDEAA]" and that "no funds appropriated by this or any other Act shall be available for any contract support costs or indirect costs associated with any contract, grant, cooperative agreement, self-governance compact, or funding agreement entered into between an Indian tribe or tribal organization and any entity other than the Indian Health Service."  *Id.* § 5326.

Reading these provisions together, the ISDEAA is clear about at least one thing: as another court in this circuit has already held, the Act "explicitly prohibits" IHS from "funding . . . indirect costs 'associated with' non-IHS entities."  *Tunica-Biloxi Tribe of La. v. United States*, 577 F. Supp. 2d 382, 418 (D.D.C. 2008) (quoting 25 U.S.C. § 5325).  It, in other words, "limit[s] the amount of indirect cost funding required of the . . . Secretary to those costs attributable to the Secretary's self-determination contract with the tribal contractor."  *Id.* at 423.  Thus, although the Act may cabin IHS's discretion, it does not eliminate the agency's role entirely; IHS has an obligation to ensure that a Tribe's request for indirect CSCs constitutes the reasonable costs resulting from the Tribe's federal health program.  Otherwise, the Tribe's proposal "is in excess of the applicable funding level for the contract," and it must be rejected.  25 U.S.C. § 5321(a)(2)(D).

The ISDEAA provides little instruction, though, on how IHS should go about fulfilling its obligation.  The Act is silent on what "reasonable" means in this context, and it does not say how indirect CSCs should be estimated.  Instead, as the Court said earlier, those calculations are guided by OMB-issued uniform cost principles that are codified in the Code of Federal Regulations.  *See generally* 2 C.F.R. pt. 200.  Those principles state that indirect CSCs may be calculated using an indirect cost rate that is determined by taking an estimate of total indirect costs associated with all of a tribal organization's federal awards together and dividing that estimate by a distribution base made up of costs resulting from those federal awards.  *See* 2 C.F.R. pt. 200, app. VII, §§ B.9, E.2.  That distribution base is usually either the total direct costs of all of those federal programs, or the portion those costs made up by salaries and wages.  *Id.* § C.2.a, c.  The product of the division equation is an indirect cost rate, which is then used to allocate indirect costs to individual contracts by multiplying the rate by the base amount attributable to the individual contract at issue.  *Id.* § C.2.a.

Here, the Tribe has agreed on an indirect cost rate with the IBC that is pegged to salaries, wages, and fringe benefits.  And the Tribe's proposal for indirect CSCs is based on application of that rate to the salaries, wages, and benefits that it contends are attributable to its federally funded health program.  In its motion for summary judgment, the Tribe seems to suggest that IHS must accept the results of this methodology in all instances.  *See, e.g.*, Pl.'s Mot. for Summ. J. at 7 ("IHS accepts the Tribe's rate, as it must."); Pl.'s Reply in Support of Mot. for Summ. J. ("Pl.'s Reply") at 7, ECF No. 15 ("IHS's 80% . . . cap lacks any grounding in the statute.").  Essentially, the Tribe says that, by rejecting the methodology here, IHS violated the ISDEAA.

The Court disagrees with this as a general contention, however.  Nothing in the OMB principles come close to indicating that the prescribed methodology will produce the statutorily

correct result every time.  To the contrary, in fact, the principles say that "[o]nce a rate has been agreed upon, it will be accepted and used by all Federal agencies *unless prohibited or limited by statute*."  2 C.F.R. pt. 200, app VII § E.1 (emphasis added); *see also id.* § C.4.b. ("Where Federal statutes restrict the reimbursement of certain indirect costs, it may be necessary to develop a special rate for the affected Federal award.").  The Tribe's Indirect Cost Negotiation Agreement with the Interior Business Center similarly states that "[u]se of the rate(s) contained in th[e] agreement is subject to any applicable statutory limitations."  Pl.'s Mot. for Summ. J., Ex. C at 2. The ISDEAA contains such a limitation, as the Court just finished explaining.  The Act permits IHS to fund only the indirect CSCs that constitute the reasonable costs resulting from the Tribe's self-determination contract for health services.  *See Tunica-Biloxi*, 577 F. Supp. 2d at 418–23. Thus, if IHS believes that the OMB-provided methodology runs astray of this requirement under the facts of a particular case, nothing prevents the agency from speaking up and proposing a modification; the agency is in fact statutorily required to do so.

## B.  The Tribe's Proposal for Indirect CSCs

Having said all of this, IHS's published *Indian Health Manual*—its guidance document on self-determination contracts and CSC awards—indicates that OMB's uniform principles are generally accepted, while also maintaining that "costs must be analyzed to ensure they meet the definition of CSC[s]" in the ISDEAA.  *See* Defs.' Cross-Mot. for Summ. J. ("Defs.' Cross-Mot."), Ex. 1 at 19, ECF No. 14-2.  In weighing the parties' specific arguments here, then, the Court starts with the premise that application of OMB's uniform principles will result in indirect CSC awards that are reasonable and consistent with the ISDEAA, absent abnormal circumstances.

IHS contends that abnormal circumstances are present here because the Tribe has allocated an unusually large portion of its IHS funds to salaries, wages, and fringe benefits.  IHS does not dispute that the Tribe has the statutory authority to redirect its federal money in this manner, *see* 25 U.S.C. § 5386, but the agency argues that it has the effect of distorting the application of OMB's methodology by creating a mismatch between the indirect cost rate and the base amount to which that rate is applied.  To understand this supposed mismatch, recall what an indirect cost rate is supposed to signify: it is "the percentage which the total amount of allowable indirect costs" for all federal contracts "bears to the [distribution] base selected."  *See* 2 C.F.R. pt. 200, app. VII, § C.2.a.  When the selected distribution base is all total direct costs, the rate is likely to be relatively low.  The rate is likely to be higher, on the other hand, when the selected base is a merely a portion of total direct costs—like salaries, wages, and benefits, which according to IHS, typically make up roughly 70 percent of the total direct costs of a federal tribal health program.  *See* Defs.' Cross-Mot., Ex. 3, Decl. of Ashley Metcalf ¶ 18, ECF No. 14-4.

Here, the Tribe has chosen to redirect its IHS funds so that 98.93 percent of its Secretarial amount is spent on salaries, wages, and benefits.  *See* Pl.'s Mot. for Summ J., Ex. B at 8–9.  Thus, the Tribe's base amount for its indirect CSC calculation more closely resembles the total direct costs of the entire program than the amount one would expect to be expended on salaries, wages, and benefits.  Yet that base amount was still subject to an indirect cost rate that had been pegged to salaries, wages, and benefits—a kind of rate that, again, is generally higher than a rate based on total direct costs.  According to IHS, therein lies the mismatch: a high indirect cost rate applied to a high base amount produces an "artificially" increased indirect CSC estimate.  Defs.' Cross-Mot. at 12, ECF No. 14.

This line of reasoning alone would maybe be sufficient for IHS if this were an APA case. Under the ISDEAA, however, it is IHS's burden to show by "clear and convincing evidence" that this claimed mismatch amounts to a statutory violation. *See* 25 U.S.C. § 5387(d). At this point in the proceedings, the agency has not yet met that burden. It has provided ample evidence that the Tribe's base amount has been inflated, but it has given the Court virtually no information about the specific inputs that would determine the Tribe's indirect cost rate under the OMB methodology. And, at the risk of stating the obvious, in order to show that a mismatch between the base amount and the rate exists, evidence concerning both the base amount and the rate is necessary. Without specific evidence about the Tribe's rate, it remains possible that the rate somehow offsets the fact that the Tribe spends an unusually high amount of money in support of salaries, wages, and benefits in relation to its federal health program.

IHS's key piece of evidence illustrates the problem quite well. With its cross-motion for summary judgment, the agency submitted financial documents from 2015 that purportedly supported the Tribe's indirect cost proposal to the IBC in support of its indirect cost rate negotiations. *See* Defs.' Cross-Mot., Ex. 2, ECF No. 14-3. Those documents, IHS claims, show that the Tribe operates a very large health program, and that the Secretarial amount funds "only a small fraction" of that program—about 10 percent. *See* Defs.' Cross-Mot. at 16, 19. According to IHS, the 2015 documents also show that IHS money funds approximately *50 percent* of the salaries, wages, and benefits for the Tribe's entire expanded health program. *Id.* at 19. In IHS's view, that figure "clearly show[s] that allowing [the Tribe] to distort the . . . cost base as it has done results in IHS paying much more than its pro rata share of indirect costs." *Id.*

Yet as the Court just said, to show distortion, IHS needs evidence concerning the Tribe's rate as well. It is possible that the 2015 documents that IHS has submitted include information to

this effect, but if they do, the information is redacted.  The distribution base, for example, that was used to determine the Tribe's indirect cost rate should have comprised costs associated with all of the Tribe's federal programs.  The submitted documents appear to include financial information regarding such other programs, but the information is redacted.  Thus, as things currently stand, the Court does not know what other federal programs the Tribe operates, and the Court certainly does not know how costly those programs are, or what percentage of those costs are for salaries, wages, and benefits.  If salaries, wages, and benefits made up a similarly high percentage of the budgets of those other federal programs, it is theoretically possible that the resulting indirect cost rate would have no distortive effect.

To be sure, IHS may not have submitted any of this evidence because it does not have it. The Tribe negotiated its indirect cost rate with the IBC; IHS played no role.  The redactions on the 2015 documents also may be the Tribe's responsibility and not the agency's.  At the same time, though, the ISDEAA places a heavy burden on IHS, and the agency has not even provided more generalized information, such as evidence that shows what typical indirect cost rates pegged to salaries might look like compared to those pegged to total direct costs.

By not providing any information whatsoever, IHS's motion for summary judgment depends on the Court accepting a critical assumption: that the Tribe's indirect cost rate does not somehow account for the unusually high amount of salaries, wages, and benefits being expended in relation to the Tribe's federal health program.  That assumption might be a reasonable one; the Court has no cause to believe that the rate does offset the effect of the inflated base amount. However, reliance on an assumption does not constitute "clear and convincing evidence" that the Tribe's proposal exceeded "the applicable funding level for the contract."  25 U.S.C. §§ 5321(a)(2)(D), 5387(d).  With specific evidence about the Tribe's indirect cost rate lacking,

summary judgment in IHS's favor is inappropriate at this time, as an issue of material fact remains unresolved.

That said, if IHS is correct in its assumption that the Tribe's indirect cost rate is incompatible with the base amount to which it is applied, the Court agrees that this presents a potential problem under the ISDEAA.  It raises the possibility that the Tribe's estimate is based on costs that are not actually "attributable to" or "associated with" the Tribe's self-determination contract.  25 U.S.C. § 5326.  The Court therefore finds that summary judgment in favor of the Tribe is unwarranted at this stage as well.

As IHS explained in its rejection letter, the Tribe's reallocation left "less than $90,000 in the remaining budget funded by the Secretarial amount."  Pl.'s Mot. for Summ J., Ex. B at 9. "Clearly," IHS said, "it would be impossible for the Tribe to operate a health care program with these remaining funds unless it was relying on its own separate revenue," so it is "obvious that the Tribe's proposed indirect CSC amount is being calculated based, at least in part, on additional resources the Tribe is choosing to use" and is "not solely based on specific activities that are necessary to support the" federal program.  *Id.*

The Tribe, for its part, does not dispute that this is true; it concedes that it is able to use its own funds to cover the remaining costs of the federal program.  According to the Tribe, it is permissible to factor those other funds into the indirect CSC calculation because "[a]t least one court has held that such third-party revenues used by a tribe to provide services under its ISDEAA agreement are part of the Secretarial amount and generate CSC just like IHS-appropriated funds."  Pl.'s Mot. for Summ. J. at 15.

But even if that other decision was correctly decided, the Tribe has not shown that it is applicable here.  The case on which the Tribe relies, *Navajo Health Foundation—Sage Memorial*

*Hospital, Inc. v. Burwell*, 263 F. Supp. 3d 1083 (D.N.M. 2016), does not say that tribes may recover CSCs generated based on all outside, supplemental funds spent in relation to a federal health program.  Rather, *Sage Memorial* presented the narrower question of whether "third-party revenue from Medicaid, Medicare, and private insurance" companies must be included in the CSC calculation.  *Id.* at 1114.  The court held that such revenue had to be included.  As the court explained, the ISDEAA "specifically notes that the 'program income earned by a tribal organization in the course of carrying out a self-determination contract . . . shall not be a basis for reducing the amount of funds otherwise obligated [to] the contract.'"  *Id.*  at 1166–67 (quoting 25 U.S.C. § 5325(m)).  A second provision of the Act similarly states that "[a]ll Medicare, Medicaid, or other program income . . . shall not result in any offset or reduction in the amount of funds the Indian tribe is authorized to receive under its funding agreement in the year the program income is received or for any subsequent fiscal year."  25 U.S.C. § 5388(j).  Thus, the source of the supplemental funding was critical in *Sage Memorial*; because the money had been "earned in the course of carrying out" the self-determination contract, it could not be excluded from the CSC calculation.  25 U.S.C. § 5325(m).

By contrast, here, the Tribe has not established that any of its supplemental funds constitute program income earned in the course of carrying out its federal health program.  In fact, the Tribe has hinted that most of the money is unrelated to the federal health program.  *See* Pl.'s Mot. for Summ. J. at 8 ("[T]he Tribe is willing and able to cover these additional expenses with its own funds and, *to a lesser extent*, third-party revenues." (emphasis added)).  Nonetheless, the Tribe argues that "this case presents an easier question than . . . *Sage Memorial*" because it has merely "proposed to recover CSC in support of *IHS-appropriated* funding, not tribal or third-party funding."  *Id.* at 15.  The argument seems to be that the Tribe's proposed

base amount for purposes of calculating indirect CSCs is made up entirely of IHS money.  But this argument fails for reasons that were already provided above: if the base has been inflated—even with IHS funds—and the indirect cost rate does not account for or offset that inflation, the effect is that the indirect CSC amount is being calculated based in part on the Tribe's own resources.  And unless those other resources turn out to be "program income" within the meaning of the ISDEAA, there is a problem, as the Tribe's estimate would be based on costs that are not actually "attributable to" or "associated with" the Tribe's self-determination contract.  25 U.S.C. § 5326.

Although the Tribe may have suggested that most of the supplemental funding it is using here does not constitute program income, the reality is that the Court currently has no information concerning the source of the money.  If the Tribe can show that its other money is program income, *Sage Memorial* may ultimately govern.  But for now, there are at least two categories of material factual issues that remain unresolved: (1) the source of the Tribe's supplemental funds; and (2) the specific circumstances surrounding the determination of the Tribe's indirect cost rate.  With these issues outstanding, the Court is unable to conclude that either party is entitled to judgment as a matter of law.

### C.  The Appropriateness of Remand

Having concluded that material factual issues remain unresolved and that summary judgment is inappropriate, the Court's final task is to determine where the factual questions should be addressed in the first instance.  IHS has suggested it is open to further negotiation, and it argues that the proper course is remand.  *See* Defs.' Reply at 7, ECF No. 17.  The Court agrees that this is the preferable approach under these circumstances.  Although the ISDEAA permits the Court to retain jurisdiction over the parties' dispute, *see* 25 U.S.C. §§ 5321(b)(3), 5331(a), it

is a well-established principle of administrative law that reviewing courts have discretion to remand to the agency upon the agency's request, *see Sierra Club v. Van Antwerp*, 560 F. Supp. 2d 21, 23 (D.D.C. 2008) (citing *Citizens Against Pellissippi Parkway Extension, Inc. v. Mineta*, 375 F.3d 412, 417 (6th Cir. 2004)).  Indeed, at least in the APA context, as long as the agency's reasons for seeking a remand are "substantial and legitimate, a remand is usually appropriate," particularly when such a course would potentially save both the parties and the court time and resources.  *Id.*, *cf. Ethyl Corp. v. Browner*, 989 F.2d 522, 524 (D.C. Cir. 1993) (Courts commonly grant agency requests for remand, "preferring to allow agencies to cure their own mistakes rather than wasting the courts' and the parties' resources reviewing a record that both sides acknowledge to be incorrect or incomplete.").

IHS's desire for remand here appears legitimate: it says that it is willing to negotiate in line with the Court's holding, and it says that it remains "flexible in offering an appropriate figure that represents [the Tribe's] CSC according to the requirements of the ISDEAA."  Defs.' Reply at 7.  As the Court has no reason to question these assertions, it thinks that the parties should be afforded another opportunity to reach an agreement before time and resources are expended on further judicial proceedings.  The Tribe also does not argue that the Court lacks the authority to remand; it contends only that remand is inappropriate because IHS's denial was contrary to the ISDEAA as a matter of law.  *See* Pl.'s Reply at 11–12.  Of course, the Court has now rejected that position and concluded that it is unable to rule in the Tribe's favor based on the current record.  In circumstances like these, the Tribe itself seems to acknowledge that remand can be beneficial.  *See id.* at 12 ("Remand is appropriate when a court requires more information to make a decision . . . .").  The Court therefore exercises its discretion to remand to IHS for further consideration, and the Court stays this case in the interim.  If the parties ultimately do

reach an agreement, they should file a stipulation of dismissal with the Court.  In the meantime, they must file a joint status report every 60 days that updates the Court on the progress of negotiations and proposes a schedule for further proceedings.

## V.  CONCLUSION

For the foregoing reasons, the Tribe's motion for summary judgment and Defendants' cross-motion for summary judgment are both **DENIED**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  March 26, 2019                                        RUDOLPH CONTRERAS
                                                             United States District Judge